[627 NYS2d 620]

PEGGY JUAREZ, an Infant, by Her Mother and Natural Guardian, NOEMI JUAREZ, et al., Respondents, v WAVECREST MANAGEMENT TEAM LTD. et al., Appellants.

First Department, May 30, 1995

## APPEARANCES OF COUNSEL

*Genevieve MacSteel* of counsel *(Jackson & Consumano,* attorneys), for Wavecrest Management Team, appellant.

*Larry J. Bonchonsky* of counsel *(Milton M. Witchel, P. C.,* attorney), for Mayaghor Realty, appellant.

*Charles J. Scheld* of counsel *(Wynne, Wynne, Seedorf & Scheld,* attorneys), for 2295 Morris Associates, appellant.

*Richard H. Bliss* of counsel *(Sheri Keller Katz* on the brief; *Michael Stewart Frankel,* attorney), for respondents.

*Lucy Billings* of counsel *(Bronx Legal Services,* attorneys), for New York City Coalition to End Lead Poisoning and others, *amici curiae.*

### OPINION OF THE COURT

ASCH, J.

Administrative Code of the City of New York § 27-2013 (h) classifies lead paint in multiple dwelling units where children under seven years old live as a hazardous violation that the owner must correct within 24 hours. Many children are poisoned as a result of owners' noncompliance with this statutory requirement.

Plaintiffs brought this action alleging that the infant plaintiff Peggy Juarez suffered severe personal injury by ingesting lead-based paint chips as a result of the negligence of the defendants, who are, respectively, the managing agent (Wavecrest), the original owner (Mayaghor) and the successor owner (2295 Morris Associates) of 2295 Morris Avenue, in the Bronx. The infant and her mother, plaintiff Noemi Juarez, lived in apartment 4C of that building where the infant allegedly ate the lead paint fragments.

The original owner, Mayaghor, obtained title to the building in September of 1984. The tenant of record, at that time and subsequently, in apartment 4C was Julio Ortiz. The mother, plaintiff Noemi Juarez, and her two daughters moved into the apartment in October of 1987 and continued living there until October 1991. She paid Mr. Ortiz, a "friend", $150 per month to rent a bedroom in the apartment, with use of the kitchen and bathroom.

According to the mother, "damaged" and peeling paint was "everywhere" in the apartment from the time she moved in. The apartment was not painted by the original owner or the successor owner while the infant and her mother lived there, "before the Department of Health came". In the bedroom where the three of them resided, and in the bathroom and kitchen which they shared, there were paint chips falling from the ceiling and on the windows, pipes and the radiator. The infant and her sister played near the window in the

bedroom where there were "a lot of peelings". They both had dust on their hands, requiring that the mother wash them constantly. On several occasions, beginning about five months after they moved in, the mother found her daughters eating the paint. Once a neighbor suggested that she "have them seen". There had been several incidents of the girls eating paint chips before the mother sought medical intervention.

The mother only complained to Mr. Ortiz concerning the paint problem and did not speak to anyone connected with the owner. About a year after the Juarez family moved into the apartment, the infant was complaining of stomach pain and showing behavioral problems. The mother took her to Lincoln Hospital. At some subsequent point in 1988, according to the mother, the infant was diagnosed as having lead poisoning. She was referred to and was admitted at Montefiore Hospital where she remained for about a week. She had outpatient treatment for the lead poisoning.

The files before the IAS Court include Montefiore's records on the infant which show positive lab results for lead and subsequent chelation therapy. According to the mother, the infant continued to play near windows, her toys covered with "lead paint dust", when she returned from Montefiore. She "constantly put her hands and her toys covered in this lead paint dust into her mouth". In December of 1988, blood tests revealed that her lead level had "increased" despite chelation therapy. Her lead level remained high in early 1989.

An XRF Analyzer Test Result form, with chemist certification, shows 39 samples of the apartment's paint taken on September 16, 1988. This test was taken by a sanitarian of the New York City Department of Health, and shows 38 positive findings of lead paint when the apartment was inspected on the indicated date.

The same sanitarian completed a "Lead Poisoning Investigation Checklist", also on the same day. According to this form, the infant had been seen eating paint chips. There were defective surfaces and peeling paint in every area of the house. There were no other environmental conditions present that would indicate a different source of lead.

On September 21, 1988, the Department of Health issued an Order to Abate Nuisance, stating that the infant resided in the apartment which was identified as a nuisance and had a specified high blood level of lead. Numerous lead poisoning violations were specified in a total of seven locations in the

apartment. The Order was addressed to the managing agent, Wavecrest. A Health Department document showed that the violations continued in December of 1988 and February of 1989.

Manir Ahmed, a principal of the original owner, testified in deposition that he went to the apartment only once when he bought the building in 1986 or 1987, at which time he did not see paint chips falling. He never had the apartment painted. Instead, he gave the tenant of record a month of rent-free tenancy with the understanding that the tenant "should" use the money to paint the apartment. He never entered the apartment to see whether or not it had been painted.

Ahmed had never seen the Order to Abate before, but his wife (also an officer of the corporation) had learned from the managing agent that the City had found a lead paint poisoning problem in apartment 4C. She advised Mr. Ahmed of the situation when he returned from a trip abroad.

A Department of Health inspection report showed that no work had been done as of October 19, 1988. Ms. Juarez stated in an affidavit that repair work on the peeling lead paint was done by a construction company hired by the City on or about November 2, 1988, but that the problem had not been completely eliminated. The defendants' copy of the Order to Abate bears the handwritten notation ("Done by Emerg. Repairs, 11/1/88, NYC, per Jose Torres").

A maintenance request maintained by the managing agent shows that the work was still on request in December of 1988. According to the mother's affidavit, a Department of Health sanitarian conducted another inspection that month, and issued a notice of remaining violations in January of 1989.

Deposition witness Robert Drummond was a principal of both the managing agent and the successor owner, which took title in January 1989. In September of 1988, the successor owner contracted for the purchase of the building, retaining the same managing agent. Mr. Drummond knew that the violation had issued in September of 1988 before going to contract, and had been under the impression that there was an "emergency repair going on". After going to contract, the successor owner was "made aware of" the "presence of lead-based paint in Apt. 4C".

Dr. Robert Gordon, who submitted a report and an expert affidavit on behalf of defendants, examined the infant in July of 1993. In his report, he acknowledged that she had elevated

levels of lead and erythrocyte protoporphyrin in her blood. He noted both the reports of her eating paint chips and the reports of her putting pencils in her mouth. He questioned whether or not her "lead poisoning" was the sole cause of her cognitive difficulties as measured by academic scores, but raised no question of whether or not she had lead poisoning. He further acknowledged that this "lead poisoning may be one contributing factor to these pattern *[sic]* of scores". In his two-page affidavit, he concluded that the infant had "low levels of lead" in her blood, which have not conclusively "affected her cognitive or behavioral performance".

In the plaintiffs' bill of particulars, it is alleged that the defendants were in violation of the Administrative Code §§ 17-142, 17-143, 17-144, 17-145, 26-127, 27-2013, 27-2114 and 27-2125, as well as section 173.13 (a) of the City Health Code and other State and Federal health regulations.

After a dispute over discovery, the managing agent and the original owner moved to strike the note of issue and the plaintiffs cross-moved for summary judgment. A prior motion by the plaintiffs for the same relief had been denied in an order dated July 17, 1989.

Without supporting factual documents, *counsel* for the original owner suggested that the infant's blood-lead may have come from sources outside the apartment or from toys or furniture in the house. The managing agent's *counsel* argued that the defendants had no notice of a child in the apartment; argued that the infant might have already had lead poisoning before coming into the building or gotten it from another source after living in the building; and questioned the evidence of the infant's ingesting paint chips.

The successor owner's *counsel* disputed the successor owner's notice of the lead condition, and its notice of the plaintiffs' presence in the apartment. Counsel suggested that the infant might have gotten lead poisoning at the plaintiffs' prior apartment, disputing the mother's testimony that the paint in that apartment was in good condition as "not preclud[ing] the rights of the various defendants to conduct an investigation to ascertain whether or not a lead paint condition also existed in that building". Counsel disputed the "causal connection" between the lead and the infant's difficulties, and the sufficiency of the evidence that the infant ate paint chips.

The IAS Court held that plaintiffs were required to establish notice, but found that the defendants had received such

notice. It rejected the defendants' "conclusory" assertions of repair and "speculation" regarding causation. After a motion for reargument, the court granted reargument but adhered to the original decision, still finding nothing but speculation on the part of defendants.

■ The prior IA order denying summary judgment did not require the successor IA Judge to deny a subsequent motion for summary judgment *(see, Country-Wide Leasing Corp. v Subaru of Am.,* 133 AD2d 735, 736, *lv denied* 70 NY2d 615). A ruling denying summary judgment does not have the effect of preclusion or law of the case establishing that there are triable issues of fact *(see, Armetta v General Motors Corp.,* 158 AD2d 284, 285). In any event, the prior order denying plaintiffs summary judgment is not binding on this Court *(see, Tesciuba v Shapiro,* 166 AD2d 281, 282, *lv denied* 77 NY2d 803).

Administrative Code § 27-2013 (h) (1) (added by Local Laws, 1982, No. 1 of City of New York [hereinafter called Local Law 1]), mandates that a landlord "shall remove" any paint or surface coating containing a level of lead in excess of a level set by the Code. In buildings predating 1960 where paint is peeling and children under the age of seven reside, it is presumed that the paint contains more than the proscribed maximum level of lead (§ 27-2013 [h] [2]). The existence of such a lead level is a class C immediately hazardous violation (§ 27-2013 [h] [3]).

The Court of Appeals has made it plain that "the Administrative Code provisions have the force of a statute" *(Guzman v Haven Plaza Hous. Dev. Fund Co.,* 69 NY2d 559, 567 [n 4]).

■ The plaintiffs' contention that violation of Local Law 1 should create absolute liability is not without some merit *(see, Van Gaasbeck v Webatuck Cent. School Dist.,* 21 NY2d 239). A violation of a statute may constitute negligence per se or may give rise to absolute liability *(supra,* at 243). " 'Only when the statute is designed to protect a definite class from a hazard of definable orbit, which they themselves are incapable of avoiding, is it deemed to create a statutory cause of action and to impose a liability unrelated to questions of negligence. This rule is based upon the view that, not being dependent upon proof of specific acts of negligence on defendant's part, the cause of action may not be defeated by proof of plaintiff's want of care. Thus, it has been said, "If the defendant's negligence consists in the violation of a statute enacted to protect a class

of persons from their inability to exercise self-protective care, a member of such class is not barred by his contributory negligence from recovery for bodily harm caused by the violation of such statute" (Restatement, Torts, § 483).' " *(Supra,* at 244, quoting *Koenig v Patrick Constr. Corp.,* 298 NY 313, 317.)

Absolute liability has been found particularly apt where the legislative purpose is to protect children *(Van Gaasbeck v Webatuck Cent. School Dist., supra; Dean v Baumann,* 39 AD2d 138, *affd* 32 NY2d 756; *Dashinsky v Santjer,* 32 AD2d 382).* "Parenthetically, it may be noted that 'children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly' *(Union Pacific Ry. Co.* v. *McDonald,* 152 U. S. 262, 277; *Day* v. *Johnson,* 265 App. Div. 383, 387). Accordingly, we are of the view that the Legislature intended to afford recompense to infants employed in violation of section 3219-a, regardless of the employer's negligence, where the dangers involved are readily apparent to adults and the cause of the accident was foreseeable." *(Dashinsky v Santjer, supra,* at 387.)

Children residing in inner city apartments are a definable class who can be expected to " 'act upon childish instincts and impulses' " *(supra,* at 387) in eating chips of paint. Landlords are in a far better position than tenants, particularly those tenants under seven, to know whether or not peeling and crumbling paint in an apartment is likely to contain lead.

While the problem of lead paint in apartments is pervasive, it is of "definable orbit" (21 NY2d, *supra,* at 244). An analogy can be made to the false certification of used motor vehicles by a retail dealer *(see, Pierce v International Harvester Co.,* 61 AD2d 255) or the problem of overly high vehicles using bridges *(see, State of New York v Gage,* 53 AD2d 794), both of which have led to legislation giving rise to absolute liability.

Local Law 1 is not a mere codification of an existing common-law duty and it is couched in terms of mandatory action by the multiple dwelling owner. Such mandatory language was found to be an indication of absolute liability in *Van Gaasbeck v Webatuck Cent. School Dist. (supra,* at 244-245).

While defendants contend there is no expression in Local Law 1 of an intent that it give rise to absolute liability, that is

also true of Administrative Code § 27-1031. However, that provision concerning excavations has, nevertheless, been held to impose absolute liability *(see, Coronet Props. Co. v L/M Second Ave.,* 166 AD2d 242, 243).

We find that there is an overriding valid public policy reason not to impose absolute liability for violations of Local Law 1. The problem of lead paint is widespread, as noted. Both the record and the briefs submitted on this appeal show that the problem exists in peeling paint, in paint chips, in dust and in other particles that can be found in any room of any poorly maintained building. The problem can be passed from owner to owner as buildings change hands, and can be found anywhere in any apartment or public area of any building. Were a rule of absolute liability to be imposed, owners would not merely have a duty to inspect for lead paint conditions but an absolute duty to *succeed* in finding every lead paint hazard everywhere in every property held. If a landlord was not successful in finding all of the lead paint—no matter how diligent the search or understandable the failure —the landlord would be absolutely liable, without any cognizable defense. As a matter of public policy, this rule of absolute liability seems draconian.

■ We find, however, that a violation of Local Law 1 constitutes negligence per se *(see, Van Gaasbeck v Webatuck Cent. School Dist., supra,* at 243). The wrongful nature of the act is fixed by statute. As both plaintiffs and *amici* note, a violation of an Administrative Code provision constitutes negligence per se where the landlord has the right to enter the premises to effect repairs necessitated by that Code provision, whether such right was exercised or not *(Guzman v Haven Plaza Hous. Dev. Fund Co., supra,* at 566-567). Here, the right to re-enter is established by Local Law 1 itself. A violation of Local Law 1 can be interpreted as one constituting "a significant structural or design defect in violation of a specific statutory safety provision" *(Quinones v 27 Third City King Rest.,* 198 AD2d 23, 24). Since the breach claimed here is one of a "specific statutory safety provision" and constitutes a "significant structural * * * defect" *(supra,* at 24), liability will ensue.

While the defective condition must be visible and longstanding *(see, Fischer v Battery Bldg. Maintenance Co.,* 135 AD2d 378, 379), the undisputed record herein shows that the problem was entirely open and visible and of long standing. The mother's uncontradicted testimony is that there was paint

peeling and paint dust everywhere in the apartment, so much so that her daughters could not play without getting their hands covered with it. The defendants submitted no evidence or affidavits to the contrary by anyone with knowledge. The original owner did one inspection when the building was purchased, and thereafter dealt with the tenant of record, without inspecting the premises.

As plaintiffs concede, this does not dispense with the requirement that the landlord have notice of the condition *(see, Putnam v Stout,* 38 NY2d 607; *Fischer v Battery Bldg. Maintenance Co., supra,* at 379), unless this Court finds that Local Law 1 imposes an affirmative duty of inspection on landowners. We conclude that it *does* impose such an affirmative duty.

Any statute should be construed to give full force and effect to the legislative intent, especially to the extent that such intent is evident from the plain language of the statute *(see, Matter of Allstate Ins. Co. v Libow,* 106 AD2d 110, 114, *affd* 65 NY2d 807). In plain and unambiguous language, the Administrative Code provision puts the burden of identifying and removing lead paint hazards upon the landlord. The Code even creates a statutory presumption that peeling paint in older buildings has the prohibited level of lead content. The legislative intent to protect children under seven, and the consequent obligations imposed upon landlords would be rendered meaningless if a landlord were not required to take action to remedy a lead condition in its building until it has received "notice" of the condition as the result of a confirmed test by others. Such a result would only encourage a landlord to remain "ignorant" and *only* obligate him to ameliorate such a condition upon notice. As plaintiffs point out, such confirmation will usually come only after a child has already been poisoned. An implied duty to inspect is, therefore, necessary to ensure that a landlord will live up to the responsibilities unequivocally imposed by the Code.

In particular, the presumption established for older buildings would be meaningless unless a landlord who takes title to such a building is under a *continuing* duty, not one satisfied by a single inspection on the date of closing, to ensure that no hazard is being caused by the lead paint condition which the law presumes. A landlord who takes on a building in such condition has commenced an affirmative undertaking, imposing a statutory duty to conduct reasonable inspections, so that a potentially dangerous condition does not worsen *(see, Watson v City of New York,* 184 AD2d 690; [even at common law, a

land owner has a duty to make reasonable efforts to inspect the property so as to determine the presence of dangerous conditions *(Willis v Young Men's Christian Assn.,* 28 NY2d 375)]).

While the Department of Health has the authority and the statutory duty to conduct inspections for violations involving lead paint levels in housing accommodations *(see, Matter of Holmes v City of New York,* 189 AD2d 676, 678), the law makes the owner responsible for lead paint abatement, not the City. Certainly, a government inspector would have had concurrent jurisdiction to inspect the YMCA facilities at issue in *Willis v Young Men's Christian Assn. (supra),* and yet the private owner therein was still held to a duty to inspect *(supra,* at 379).

■ ■ The application of this standard, rather than that of absolute liability, imposes on the landlord a standard of reasonableness. The landlord may, unlike the case with absolute liability, persuade the fact finder that the existence of a lead paint hazard existed *despite* his diligent and reasonable efforts to prevent it.

Of course, in this case, in response to plaintiffs' sworn assertions concerning the extent of the lead paint condition, defendants only answered by affirmations of counsel without personal knowledge of the underlying facts. In addition, as pointed out by the IAS Court, defendants did not submit evidentiary factual opposition but only conjecture and surmise in their attempt to defeat the motion for summary judgment.

Defendants contend that the medical test results in the record are insufficient proof of lead paint poisoning. However, defendants' own expert admitted that the infant had "lead poisoning" which "may be one contributing factor to these pattern *[sic]* of scores". All three defendants have effectively admitted that there was lead in the paint found in the Ortiz apartment. Further, the defendants presented nothing in opposition to the motion but bald and conclusory *attempts* by counsel to raise an issue of fact as to the accuracy of the tests. A party challenging the reliability of a scientific test should itself produce scientific evidence that raises a question of fact *(see, Matter of Vasquez v Coughlin,* 118 AD2d 897, 899 ["(n)o scientific evidence was presented by petitioner which created an issue of fact"]). The mere anticipation of discrediting a witness on cross-examination is not enough to defeat an otherwise meritorious motion for summary judgment *(see, Badman v Civil Serv. Empls. Assn.,* 91 AD2d 858).

The IAS Court was correct, therefore, to reject defendants' remaining assertions of alleged fact issues as speculation, conjecture and surmise. "[O]ne opposing a motion for summary judgment must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim * * * [M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" *(Zuckerman v City of New York,* 49 NY2d 557, 562; *see also, Amatulli v Delhi Constr. Corp.,* 77 NY2d 525, 533). The defendants' medical expert did not dispute the fact that the infant had been lead poisoned. He disagreed with plaintiffs only on the degree to which the infant was impaired, which is only a damages issue. The speculation of defendants' counsel as to a myriad of other possible causes of the infant's lead poisoning is not supported by any document, fact witness, expert opinion, or anything other than counsel's hypothesizing. In contrast, plaintiffs, in support of the motion, submitted factual evidence in the form of an affidavit from the mother that the source of the lead poisoning was from the subject premises and documentary evidence showing that the City sanitarian rejected the possibility of any other environmental source of lead. As noted, this factual showing was essentially not disputed by defendants.

However, as plaintiffs do not dispute, the managing agent for a known principal will be held liable in such cases only if it was in complete and exclusive control of the building *(Keo v Kimball Brooklands Corp.,* 189 AD2d 679, 680). Plaintiffs did not submit any evidence that Wavecrest, the managing agent herein, was in such complete control. Accordingly, summary judgment should not have been granted against the defendant managing agent.

While plaintiffs assert that the managing agent failed to prove that it did not have complete control of the building, plaintiffs did not sustain their initial burden on the summary judgment motion, and denial would have been the proper disposition without regard to the sufficiency of the opposing papers *(Alvarez v Prospect Hosp.,* 68 NY2d 320, 324).

Further, the successor owner, Morris, assumed ownership of the subject premises on January 18, 1989, *after* the City contractor had performed the abatement work, and *after* the infant plaintiff had been diagnosed and treated. However, there was evidence in the record that lead paint violations had been reported on December 27, 1988, and that the succes-

sor owner allowed the condition to persist for a very short time before the action was commenced. Thus, an issue of fact was raised as to the infant plaintiff's continued exposure during this short time the successor owner, Morris, held title to the building. Accordingly, the motion should have been denied as against this defendant also.

In the case before us, the court has sought to achieve a balance among competing interests in its interpretation and application of section 27-2013 (h).

Accordingly, the order of the Supreme Court, Bronx County (Jerry Crispino, J.), entered February 9, 1994, which, insofar as appealed from, granted plaintiffs' cross motion for summary judgment on the issue of liability as against defendants-appellants, should be unanimously modified, on the law, to deny the motion for summary judgment as against defendant Wavecrest and defendant 2295 Morris Associates, and otherwise affirmed, without costs.

The appeal from the order of the same court and Justice entered March 23, 1994, which granted defendant Mayaghor Realty's motion for reargument and adhered to the original determination, should be dismissed as academic, without costs.

SULLIVAN, J. P., ROSENBERGER, KUPFERMAN and MAZZA-RELLI, JJ., concur.

Order, Supreme Court, Bronx County, entered February 9, 1994, which, insofar as appealed from, granted plaintiffs' cross motion for summary judgment on the issue of liability as against defendants, modified, on the law, to deny the motion for summary judgment as against defendants Wavecrest and 2995 Morris Associates, and otherwise affirmed, without costs; the appeal from the order of the same court and Justice, entered March 23, 1994, dismissed as academic.