OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This case, brought on behalf of a child suffering from lead
 
 *638
 
 poisoning, presents our first opportunity to consider the liability of a landlord who has allegedly failed to comply with the lead abatement provision of the Administrative Code of the City of New York. That provision, Local Law 1, requires the owner of a multiple dwelling to "remove or cover” paint containing specified hazardous levels of lead in any apartment in which a child six years of age or younger resides (Administrative Code of City of NY § 27-2013 [h]). We are asked: does Local Law 1 obligate building owners to ascertain whether such a child resides in any of the dwelling units and then to inspect those units for dangerous lead conditions?
 

 We hold that to establish liability plaintiffs must demonstrate that the building owner had actual or constructive notice that a child six years of age or under was living in one of its residential units. Under the statutory scheme, a landlord who has such notice is chargeable with notice of any hazardous lead condition in that unit.
 

 Here, defendant landlord has failed to contest plaintiffs’ allegations that a lead hazard existed in the apartment and that defendant made no attempt to remedy it. Defendant has also failed to rebut plaintiffs’ prima facie showing of causation. Thus, no triable issues exist regarding defendant’s constructive notice of the hazard, the reasonableness of abatement efforts or causation — these issues were all correctly resolved against the landlord. There remains for resolution only the disputed question whether defendant had notice of the residency of a child under seven.
 

 Facts
 

 Defendant Mayaghor Realty obtained title to the building at 2295 Morris Avenue in the Bronx in September 1984. The tenant of record in apartment 4C at that time was Julio Ortiz. The lease between Mayaghor and Ortiz prohibited the tenant from subletting all or part of the apartment. Nevertheless, in October 1987, plaintiff Noemi Juarez and her two infant daughters sublet part of apartment 4C from Ortiz. Juarez paid Ortiz $150 per month to rent a bedroom and for use of the kitchen and bathroom. This arrangement continued until October 1991.
 

 According to Juarez, peeling paint from the outset pervaded the apartment, with paint chips on the window, pipes, radiator and falling from the ceiling. On several occasions, she observed both daughters with paint dust on their hands and found them eating paint chips. At no time during their residency did
 
 *639
 
 anyone paint the apartment. Although Juarez complained to Ortiz about this problem, she never spoke to anyone connected with the owner.
 

 After approximately a year, two-year-old plaintiff Peggy Juarez began complaining of stomach pain and exhibiting behavioral problems. In 1988, she was diagnosed as having lead poisoning. She received treatment at Montefiore Hospital and subsequently underwent outpatient chelation therapy.
 

 On September 16, 1988, a New York City Department of Health sanitarian took 39 samples of paint from apartment 4C, and 38 of those samples tested positive for lead paint. A "Lead Poisoning Investigation Checklist” completed by the sanitarian that day indicates that Peggy had been seen eating paint chips, that there were defective surfaces and peeling paint in every area of the apartment, and that no other environmental conditions indicating a different source of lead were present.
 

 Five days later, the Department of Health issued an Order to Abate Nuisance to the managing agent of the building, Wavecrest Management Team Ltd. The Order explained that a child with a specified high blood level of lead resided in apartment 4C, which was identified as a nuisance. The Order further stated that an inspection of the apartment had revealed paint containing levels of lead in violation of New York City Health Code § 173.13 (c) and (d) and detailed numerous lead contamination violations in seven areas of the apartment.
 

 A principal of Mayaghor acknowledged during his deposition testimony in February 1992 that the corporation learned from Wavecrest that the City had discovered a lead poisoning problem in apartment 4C. Nevertheless, a subsequent Health Department inspection report showed that, as of October 19, 1988, the problem had not been corrected. Finally, on or about November 2, 1988, a construction company hired by the City commenced repairs but failed to eliminate the problem. A Department of Health sanitarian conducted another inspection of the apartment in December 1988 and issued a notice of remaining violations in January 1989. A Department of Health document established that the lead violations continued as late as February 1989.
 

 Consequently, when Peggy returned from the hospital, her toys remained covered with dust and she continued to put her dust-covered hands into her mouth. Blood tests conducted in December 1988 revealed that, notwithstanding the treatment
 
 *640
 
 and therapy, her lead level had increased, and it remained high in early 1989.
 

 Plaintiffs subsequently brought this action against defendants Mayaghor, Wavecrest and the successor owner of the building (2295 Morris Associates), alleging that Peggy suffered injury as a result of the defendants’ negligence. In their bill of particulars, plaintiffs claimed that defendants violated various provisions of the Administrative Code, the City Health Code and other State and Federal health regulations.
 

 Plaintiffs moved for summary judgment as to liability, arguing that landlords have an affirmative duty to inspect multiple dwelling units for dangerous lead conditions. Although the trial court rejected this argument, it granted plaintiffs’ motion nonetheless, concluding that defendants had acquired notice of the lead condition and that a child was living in the apartment upon receiving the Department of Health Order. The court further found that there was no evidence that defendants took any steps to alleviate the dangerous condition.
 

 On appeal, the Appellate Division concluded that summary judgment should have been denied against Wavecrest, since plaintiffs failed to submit evidence that Wavecrest had complete and exclusive control of the building. The court also denied summary judgment against the successor owner, finding an issue of fact as to the infant plaintiff’s continued exposure to a lead condition after 2295 Morris Associates assumed ownership of the premises. As to defendant Mayaghor, the Appellate Division affirmed the grant of summary judgment, holding that Local Law 1 imposes an affirmative duty of inspection on landowners irrespective of notice, and granted Mayaghor leave to appeal.
 

 We conclude that liability does not attach under Local Law 1 unless a landlord has actual or constructive notice that a child under seven resides in the apartment, but that landlords with such knowledge may be charged with notice of dangerous lead conditions within their buildings. Because a material issue of fact exists here as to whether defendant had notice prior to receipt of the Order to Abate Nuisance that a child under seven was living in apartment 4C, we remit for further proceedings on that limited issue.
 

 Legal Analysis
 

 Background of Local Law 1
 

 The serious health hazard posed to children by exposure to lead-based paint is by now well established. Children under the
 
 *641
 
 age of six, whose nervous systems are still developing, are particularly vulnerable to the damage caused by lead poisoning. High blood lead levels can produce brain damage, coma or death, and even relatively low levels can lead to significant nervous system damage
 
 (see,
 
 1995 Report of Lead-Based Paint Hazard Reduction and Financing Task Force,
 
 Putting the Pieces Together: Controlling Lead Hazards in the Nation’s Housing,
 
 at 3; Oct. 1991 Statement by Centers for Disease Control and Prevention,
 
 Preventing Lead Poisoning in Young Children,
 
 at 7-10 [4th rev]).
 

 While the use of lead-based paint on interior building surfaces has been prohibited since January 1960
 
 (see,
 
 NY City Health Code § 173.13), such paint continues to cover the walls of two out of three City dwellings
 
 (see,
 
 1993 Final Report of Mayor’s Advisory Comm to Prevent Childhood Lead-Paint Poisoning, at 1). Its widespread use thus renders lead poisoning a continuing threat to the health of young children in New York City, especially those in older and poverty-ridden neighborhoods
 
 (see, New York City Coalition To End Lead Poisoning v Koch,
 
 138 Misc 2d 188, 189,
 
 affd
 
 139 AD2d 404; 1995 Report of Lead-Based Paint Hazard Reduction and Financing Task Force,
 
 Putting the Pieces Together: Controlling Lead Hazards in the Nation’s Housing,
 
 at 3). Indeed, "[c]hildhood lead-paint poisoning may be the most significant environmental disease in New York City, in terms of the numbers of cases, the severity of the medical damage created, and the personal, social, and economic costs it imposes” (1993 Final Report of the Mayor’s Advisory Comm to Prevent Childhood Lead-Paint Poisoning, at 1).
 

 Abatement of lead-based paint is an expensive process
 
 (see,
 
 Coyne,
 
 Lead Paint Abatement: Who Should Pay?, 2
 
 Wis Envtl LJ 113, 115, n 9 [Winter 1995] [estimating abatement costs to range from 20 cents to $130.96 per square foot]; Miceli, Pancak and Sirmans,
 
 Protecting Children From Lead-Based Paint Poisoning: Should Landlords Bear the Burden?,
 
 23 BC Envtl Aff L Rev 1, 8 [Fall 1995]). With nearly two million apartments in New York City built before lead-based paint was banned in 1960, addressing this problem therefore requires a weighing of policy interests, a responsibility that rests with Federal, State and local legislative bodies.
 

 At issue here is the lead abatement legislation adopted by the New York City Council in 1982 and contained in the Housing Maintenance Code, Local Law 1. It provides:
 

 "The owner of a multiple dwelling shall remove or
 
 *642
 
 cover in a manner approved by the department any paint or other similar surface-coating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside” (Administrative Code § 27-2013 [h] [1]).
 

 Paragraph (2) establishes a rebuttable presumption that, in any unit within a multiple dwelling erected prior to 1960 in which a child six years of age or under resides, any peeling paint or similar surface-coating material contains more than the specified level of lead. Paragraph (3) classifies the existence of paint or other substance containing the designated level of lead in an apartment with a child six years of age or younger to be a class C immediately hazardous violation, which must be corrected within 24 hours
 
 (see,
 
 Administrative Code § 27-2115 [c]).
 

 Plaintiffs argue that the failure to keep a residential unit free of lead-based paint, in violation of Local Law 1, gives rise to absolute liability. Alternatively, they urge that defendant negligently failed to maintain the premises in a reasonably safe condition by failing to comply with Local Law 1. Defendant counters that it cannot be liable for plaintiff’s injuries because, prior to receiving the Health Department Order, it had no notice that the infant plaintiff resided on the premises or of the dangerous lead condition.
 

 Resolution of these questions requires a brief review of some general principles of premises liability.
 

 Premises Liability
 

 Generally, a landlord may be held liable for injury caused by a defective or dangerous condition upon the leased premises if the landlord is under a statutory or contractual duty to maintain the premises in repair and reserves the right to enter for inspection and repair
 
 (see, Guzman v Haven Plaza Hous. Dev. Fund Co.,
 
 69 NY2d 559, 565-566;
 
 Worth Distribs. v Latham,
 
 59 NY2d 231, 238). Additionally, the burden is on the plaintiff to prove not only that a dangerous condition existed on the premises but also that the landlord had notice of that condition and a reasonable opportunity to repair it
 
 (Madrid v
 
 
 *643
 

 City of New York,
 
 42 NY2d 1039;
 
 Putnam v Stout,
 
 38 NY2d 607, 612;
 
 Eddy v Tops Friendly Mkts.,
 
 91 AD2d 1203,
 
 affd
 
 59 NY2d 692).
 

 At common law landlords had no duty to maintain leased premises, other than common areas, in good repair
 
 (Altz v Leiberson,
 
 233 NY 16, 17;
 
 see,
 
 Prosser and Keeton, Torts § 63, at 434 [5th ed]; 2 Rasch, New York Landlord and Tenant— Summary Proceedings 18:1, at 30-31 [3d ed]). This was changed by adoption of the Tenement House Act (L1901, ch 334). Its successor, the Multiple Dwelling Law, directs that "[e]very multiple dwelling * * * and every part thereof and the lot upon which it is situated, shall be kept in good repair” (§ 78 [1]). This statute thus imposes upon a landlord “a duty to persons on its premises to maintain them in a reasonably safe condition”
 
 (Mas v Two Bridges
 
 Assocs., 75 NY2d 680, 687;
 
 see also, Altz v Leiberson,
 
 233 NY at 17-18,
 
 supra).
 
 New York City landlords are further charged under the Administrative Code with the responsibility for safe maintenance of their buildings and facilities (Administrative Code §§ 27-127, 27-128;
 
 see, Guzman v Haven Plaza Hous. Dev. Fund Co.,
 
 69 NY2d at 566,
 
 supra).
 

 In addition to these general obligations to remedy any defective condition on the premises, Local Law 1 imposes a specific duty to ameliorate hazardous levels of lead-based paint. Correlative with the specific obligation to abate a hazardous lead condition, Local Law 1 implicitly grants landlords the right of entry to effectuate such repairs
 
 (see, Gildea v Harris Fine Realty & Constr. Co.,
 
 249 App Div 775;
 
 see also,
 
 Administrative Code § 27-2008 [giving owner right to enter premises to make repairs required by the code]). Local Law 1 thus vests landlords with sufficient control over leased premises to sustain liability
 
 (see, Worth Distribs. v Latham,
 
 59 NY2d at 238,
 
 supra).
 
 The nature of the liability imposed by Local Law 1 is the subject to which we next turn.
 

 Liability Under Local Law 1
 

 We reject plaintiffs’ argument that violation of Local Law 1 results in absolute liability, under which "[n]o excuse is recognized, and neither reasonable ignorance nor all proper care will avoid liability” (Prosser and Keeton, Torts § 36, at 227 [5th ed]). Unlike lead paint measures adopted in some other jurisdictions, Local Law 1 does not establish a statutory cause of action for civil remedies
 
 (compare,
 
 Mass Gen Laws Ann ch 111, § 199). Furthermore, while Local Law 1 is unques
 
 *644
 
 tionably intended to protect a definite class of persons from a particular hazard they are incapable of avoiding themselves, examination of the Administrative Code provisions at issue does not reveal an intent to impose liability without regard to fault
 
 (see, Trimarco v Klein,
 
 56 NY2d 98, 108;
 
 Van Gaasbeck v Webatuck Cent. School Dist.,
 
 21 NY2d 239, 244).
 

 Indeed, Local Law 1 does not itself create an additional standard of care. Rather, Local Law 1 defines a particular hazardous condition — the presence of specified levels of lead-based paint in an apartment occupied by a child six years of age or under — to which a landlord’s general duty to repair applies. That is, Local Law 1 simply obligates landlords to remedy a specific dangerous defect. Breach of a landlord’s general statutory duty to maintain leased premises in a safe condition, moreover, does not impose liability without fault, but requires a showing of those elements comprising common-law negligence
 
 (see, Altz v Leiberson,
 
 233 NY at 18,
 
 supra; Collins v Noss,
 
 258 App Div 101,
 
 affd
 
 283 NY 595).
 

 Consequently, we agree with the Appellate Division that Local Law 1 imposes "a standard of reasonableness” that allows a landlord to "persuade the fact finder that the existence of a lead paint hazard existed
 
 despite
 
 his diligent and reasonable efforts to prevent it” (212 AD2d 38, 48) (emphasis in original). Local Law 1 places a duty on landlords to abate a lead hazard. Where, however, a landlord establishes that it exercised due care, it will not be held liable. To avoid liability, a landlord must prove that, even though it violated Local Law 1, it was acting reasonably under the circumstances.
 

 That liability turns on the reasonableness of a landlord’s efforts to ameliorate or prevent a dangerous lead condition is supported by the regulatory scheme. Tellingly, Local Law 1 does not provide how the abatement of a hazardous lead condition is to be accomplished or provide its own safety measures but states that the defect shall be removed or covered "¿n
 
 a manner approved by the
 
 department” (Administrative Code § 27-2013 [h] [1] [emphasis added]). Local Law 1 expressly defers to the rule-making authority of the Department of Housing Preservation and Development to establish the requisite safeguards. Chapter 11 of title 28 of the Rules of the City of New York sets forth the precise methods by which a landlord
 
 *645
 
 must abate paint containing excessive amounts of lead
 
 (see,
 
 28 RCNY 11-04).
 
 *
 

 Thus, although Local Law 1 establishes that landlords have a duty to remedy a hazardous lead condition, the specific contours of that duty are dictated by City regulation. It has long been the rule in this State that a regulation of an administrative agency is merely some evidence to be considered on the question of a defendant’s negligence
 
 (see, Zimmer v Chemung County Performing Arts,
 
 65 NY2d 513, 522;
 
 Major v Waverly & Ogden,
 
 7 NY2d 332, 336;
 
 Schumer v Caplin,
 
 241 NY 346). It follows, then, that the adequacy of a landlord’s efforts to discharge its duty to remedy a hazardous lead condition is to be governed by a standard of reasonableness.
 

 Notwithstanding its determination that Local Law 1 allows landlords to avoid liability where they demonstrate reasonable care, the Appellate Division also reached the inconsistent conclusion that all violations of Local Law 1 constitute negligence as a matter of law. In doing so, it relied on the fact that the landlord’s duty is "fixed by statute” (212 AD2d at 46). While we have held that Administrative Code provisions imposing a specific duty have the force of statute
 
 (see, Bittrolff v Ho’s Dev. Corp.,
 
 77 NY2d 896, 899;
 
 Guzman v Haven Plaza Hous. Dev. Fund Co.,
 
 69 NY2d at 566,
 
 supra),
 
 whether a court determining the tort consequences arising from their breach should treat Administrative Code provisions as State legislative enactments that may give rise to negligence per se — rather than as local ordinances amounting to some evidence of negligence — is a separate question. Given our conclusion that the particular Administrative Code provision before us incorporates a standard of reasonableness, however, we need not resolve this broader question.
 

 Here, there is no issue as to the reasonableness of defendant’s abatement efforts — defendant did not allege in opposition to plaintiffs’ motion for summary judgment that it took any steps whatsoever to remedy the hazardous lead condition. Defendant’s only argument was that it could not be held liable for
 
 *646
 
 the infant plaintiffs injuries because it lacked notice of both the existence of lead-based paint exceeding the stated threshold and the residency of a child.
 

 Notice
 

 It is well settled that in order for a landlord to be held liable for injuries resulting from a defective condition upon the premises, the plaintiff must establish that the landlord had actual or constructive notice of the condition for such a period of time that, in the exercise of reasonable care, it should have been corrected
 
 (see, e.g., Piacquadio v Recine Realty Corp.,
 
 84 NY2d 967, 969;
 
 Worth Distribs. v Latham,
 
 59 NY2d at 238,
 
 supra; see also, Putnam v Stout,
 
 38 NY2d at 612,
 
 supra).
 
 In construing Local Law 1, which creates a basis of landlord liability not recognized under the common law, we must presume that the City Council was aware of the common-law rule and abrogated it only to the extent indicated by the clear import of its enactment
 
 (Morris v Snappy Car Rental,
 
 84 NY2d 21, 28;
 
 B & F Bldg. Corp. v Liebig, 76
 
 NY2d 689, 693).
 

 Under Local Law 1, lead-based paint constitutes a hazard when two conditions are present:
 
 first,
 
 lead in an amount exceeding the stated threshold and
 
 second,
 
 a child six years of age or under residing in the apartment. Manifestly, neither Local Law 1 itself nor the regulations promulgated thereunder expressly eliminate the common-law notice requirement as to either element
 
 (see,
 
 Administrative Code § 27-2013 [h]; 28 RCNY 11-01 — 11-07). To the contrary, the regulatory scheme explicitly provides for notice to the landlord of the presence of hazardous levels of lead-based paint in an apartment occupied by a child
 
 (see,
 
 28 RCNY 11-06) and allows the landlord an opportunity to remedy the condition after receiving notice
 
 (see,
 
 Administrative Code § 27-2115 [c]). To be liable for injuries caused by the lead hazard, then, a landlord must have actual or constructive notice of both the hazardous lead condition and the residency of a child six years of age or younger.
 

 Nor does Local Law 1 require landlords affirmatively to ascertain whether children six years of age or under reside in their buildings. The absence of language charging landlords with such a duty of inspection is particularly telling when the lead abatement scheme is compared to the regulatory provisions requiring landlords to install window guards in multiple dwellings
 
 (see,
 
 Administrative Code § 17-123; 24 RCNY 12-03 [c]). Under the window guard law, a landlord is explicitly required to deliver an annual notice to each residential unit
 
 *647
 
 explaining the obligation to install window guards and inquiring whether children 10 years of age or younger reside in the apartment
 
 (see,
 
 Administrative Code § 17-123; 24 RCNY 12-03 [a], Appendix B). "When a tenant fails to return this annual notice, ''the landlord or his agent shall at reasonable times inspect the dwelling unit to ascertain whether a child 10 years of age or younger resides in the dwelling and if so, whether approved window guards are properly installed and maintained” (24 RCNY 12-03 [c]).
 

 Given the absence of similar inspection provisions under Local Law 1, we conclude that the City Council did not intend to charge landlords with the responsibility of determining whether young children reside in any of their dwelling units. For the reasons that follow, however, we hold that where a landlord has notice that a child under the specified age is residing in an apartment, Local Law 1 provides for constructive notice of the hazardous lead condition.
 

 Local Law 1 places a specific duty on landlords to abate lead paint in leased premises where children under the specified age reside
 
 (see,
 
 Administrative Code § 27-2013 [h]). It further establishes a presumption that, in any building erected prior to 1960, peeling paint in a dwelling unit occupied by a child six years of age or under comprises a hazardous lead condition
 
 (see,
 
 Administrative Code § 27-2013 [h] [2]). Local Law 1 thus gives landlords authority to enter dwelling units occupied by such children for the very purpose of inspecting for and repairing a lead paint defect
 
 (see also,
 
 Administrative Code § 27-2008 [granting right of entry to repair and inspect premises in order to comply with code]).
 

 We have held, moreover, that a building owner may be charged with constructive notice of defects in those parts of the building into which it has authority to enter
 
 (see, e.g., Guzman v Haven Plaza Hous. Dev. Fund Co.,
 
 69 NY2d at 565-566,
 
 supra; Tkach v Montefiore Hosp.,
 
 289 NY 387, 389-390,
 
 supra).
 
 Thus, retention in the lease of the right to enter the interior of an apartment to inspect the premises has sufficed to charge an out-of-possession landlord with constructive notice of a defect within the apartment
 
 (see, Tkach v Montefiore Hosp.,
 
 289 NY at 389-390). Likewise, the right of entry conferred by Local Law 1 gives a landlord constructive notice of any lead paint hazard within an apartment that the landlord knows is occupied by a child of the specified age.
 

 Here, defendant acknowledges that, as of the date it received the Order to Abate Nuisance, it had actual notice both that a
 
 *648
 
 child under the requisite age was residing in apartment 4C and that the apartment contained hazardous levels of lead. Plaintiffs concede that, prior to that date, a material issue of fact exists as to whether defendant had notice that apartment 4C was occupied by children under the age of seven. Noemi Juarez admitted in her deposition testimony that she never informed anyone at Mayaghor of her prohibited agreement with Ortiz, and defendant disputes her allegation that its agent, the building superintendent, saw her family move into the building.
 

 If, however, defendant had knowledge that a child under seven resided in the apartment, it may be charged with notice of the lead hazard prior to receipt of the Order. Defendant had a right of entry under Local Law 1 as well as the lease and failed to contest plaintiffs’ allegation of a long-standing, manifest peeling paint condition.
 

 Causation
 

 As a final matter, we determine that plaintiffs established causation as a matter of law.
 

 Plaintiffs’ proof sufficed to establish prima facie causation. In particular, they produced evidence that the apartment contained hazardous levels of lead-based paint, that Peggy Juarez was observed ingesting paint chips and dust and had elevated blood levels of lead, that Peggy was never out of her mother’s custody for any substantial period of time and that she did not complain of stomach pains or manifest certain behavioral changes prior to moving into this apartment.
 

 In response, defendant submitted speculative assertions by its attorney as to other possible sources of the lead poisoning and Peggy’s behavioral disorders. The bare allegations of counsel, who lacked personal knowledge of the underlying facts, do not constitute competent evidentiary proof sufficient to defeat a motion for summary judgment (see,
 
 Zuckerman v City of New York,
 
 49 NY2d 557, 562-563). The only other proof offered was an affidavit by Dr. Robert M. Gordon, an expert physician who evaluated Peggy. Although he did not dispute the diagnosis of lead, poisoning and even agreed that it may have contributed to Peggy’s deficiencies, Dr. Gordon speculated that they may also have been the result of her bilingual background and parents’ education level. Such surmise, however, is insufficient to raise a triable issue of fact.
 

 
 *649
 
 Conclusion
 

 In sum, we conclude that Local Law 1 does not impose on landlords a continuous and affirmative duty to inspect for the residence of children under seven. The law, however, does allow landlords to be charged with notice of dangerous lead conditions in their building. Whether a landlord has satisfied its duty to remedy a hazardous lead condition is governed by a standard of reasonableness. Here, defendant had constructive notice of the hazardous lead condition in apartment 4C; there is no issue as to the reasonableness of its abatement efforts — it made none; and no triable issue of fact exists as to causation. Only the narrow question of notice of the residency of a child under seven remains open for determination.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, plaintiffs’ cross motion for partial summary judgment as to liability with respect to defendant Mayaghor Realty, Inc., denied and the certified question answered in the negative.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ci~ parick concur.
 

 Order reversed, etc.
 

 *
 

 Section 11-04 of those Rules authorizes the following "Methods of Removal and Covering of Paint”: "The paint or other similar surface coating material in § 11-01 above shall be covered by applying dry wall construction; however, in the alterative, the paint or other similar surface coating material may be removed by scraping all loose paint and providing plaster weld or other bonding agent with the existing surface and applying two (2) coats of paint. Where the condition is recurring, and there is evidence of continued moisture, the alternative method will not be acceptable” (28 RCNY 11-04).