*487 OPINION OF THE COURT
Per Curiam.
Order entered November 2, 1995 affirmed with $10 costs.
Alleging that chipping and peeling paint in her Bronx apartment created a lead hazard for her infant daughter, tenant Ana Baez (the respondent in the underlying nonpayment proceeding) sought a court-ordered inspection to test the apartment premises for lead. Tenant’s motion was granted on consent to the extent of setting the matter down for a hearing to determine the lead levels present in the apartment.
At the hearing, which spanned three court dates, the parties presented conflicting expert opinion testimony and divergent scientific test results on the lead hazard issue. Civil Court expressly credited the evidence offered by the tenant’s expert witness, Dr. Martin Rutstein, a Ph D in environmental geochemistry, whose qualifications and extensive history of professional achievement are beyond the pale of legitimate dispute and, indeed, are undisputed. That evidence showed that lead paint was present in amounts exceeding the governing statutory threshold (see, Administrative Code of City of NY § 27-2013 [h])* in two specified areas of tenant’s apartment, including a living room wall which measured 1.7 milligrams of lead per square centimeter, a reading substantially higher than the .7 milligram level stated in the Administrative Code. The measurements relied upon by Dr. Rutstein were obtained using what was described as an “X-ray fluorescence” (XRF) test, an “expensive” test to administer and one which, according to Rutstein, is the prevailing “method of choice” in lead inspection. Dr. Rutstein opined that the XRF test produces an “area”based measurement which, given its capacity to factor into its result “the density of the paint [and] the number of layers”, is well suited to accurately determine the true levels of lead in the “relatively thick”, “multiple layers of paint” commonly found in New York City apartments. As to so-called “substrate correction”—a term defined in the record as “the action of [subtracting] from your readings whatever [lead] is underneath *488 the material that is being analyzed”—Dr. Rutstein stated that while “primitive” test instruments required the operator to do substrate correction manually, some test instruments now in use, including the type used by his firm to test tenant’s apartment, contain an “onboard”, substrate correction computer program “sufficient to give * * * usable data without manually removing the paint.” Dr. Rutstein expressed skepticism about the accuracy and reliability of another lead testing method now in use, a “weight”-based test known variously as the “paint chip” or “atomic absorption” test, which this landlord used in obtaining a negative lead finding in its inspection of the tenant’s apartment. (“It’s a quick, dirty, relatively inexpensive way of getting data [that] does not penetrate deeply enough to find [lead present in the bottom layers of a paint chip]”.)
Civil Court, describing the evidence presented by tenant’s expert witness as “more convincing and compelling” than the expert and other evidence elicited by the landlord, found that a lead hazard exists in tenant’s apartment and directed the landlord to abate it. The landlord now appeals, and we affirm.
The lead abatement provision of the Administrative Code requires an owner of a multiple dwelling to “remove or cover” paint containing specified hazardous levels of lead in any apartment in which a child six years of age or younger resides (Administrative Code § 27-2013 [h]). Under paragraph (1) of the statute, paint is considered hazardous if it produces “a reading of 0.7 milligrams of lead per square centimeter or greater or contain[s] more than 0.5 percent of metallic lead based on the non-volatile content of the paint”. (Emphasis added.) Thus, as the hearing court properly recognized and as the appellant landlord now expressly acknowledges, a violation of the statute is established upon a showing that the level of lead in a covered apartment unit exceeds the stated threshold either by area measurement (.7 milligrams per square centimeter) or by weight measurement (.5% based on the nonvolatile content of the paint). Applying the statute to this case, we agree that the tenant established a dangerous lead condition by showing that her apartment contained lead-based paint in amounts at or greater than .7 milligrams per square centimeter when measured by a properly calibrated “area” testing device. Inasmuch as the landlord failed to meaningfully impugn the accuracy of the tenant’s “area” test results or to produce any countervailing “area” test results of its own, its reliance upon the negative results it obtained via a “weight”-based inspection test is insufficient, under the clear import of the statute, to avoid a finding that a lead hazard exists in the apartment.
*489 The “summary report” on lead paint testing technologies issued by the United States Environmental Protection Agency (EPA), the lone Federal agency report introduced into evidence by petitioner and contained in the record on appeal, does not strongly support petitioner’s contention that tenant’s test results were “inaccurate”. One of the “primary” conclusions of the report was that the area-based testing method used here on behalf of the tenant generally provides “a viable way to test for lead-based paint”, at least when conducted by a properly trained and licensed XRF instrument operator. The findings of the EPA report do not, as petitioner urges, indicate that a positive area-based test result necessarily would be flawed if done without “manual substrate correction”; rather, the report indicates that such test results are “often effective * * * when using * * * substrate correction, as needed.” (Emphasis added.) Moreover, the results of the EPA study significantly included an express finding that “the incidence of large XRF [area-based testing] errors was very low”, a finding consistent with the tenant’s expert’s unimpeached testimony that the XRF reading relied upon by the tenant is subject to a “.3[%] plus or minus statistical uncertainty”. On this record, and since the 1.7 milligram reading obtained by the tenant is beyond what the EPA report itself defines as an “inconclusive” reading, it appears unlikely that the lack of a manual substrate correction of tenant’s test results yielded a “false positive” reading in this case. As to petitioner’s “expert”, Cassidy—who earned a Bachelor of Science degree in business administration and who, while having “received training on lead paint testing”, admittedly is not certified to use nor has in fact ever used an XRF testing device “in the field”—we find no abuse of discretion in the trial court’s evidentiary ruling precluding that witness from testifying as to how such a testing device is “supposed to be used”, and certainly no error so prejudicial as to warrant reversal in the context of this appeal.
Insofar as this case can be viewed as presenting a battle of the experts, we find that the hearing court’s “acceptance of [tenant’s] case was a rational and fair interpretation of the evidence” (Lillis v D’Souza, 174 AD2d 976, 977, lv denied 78 NY2d 858; see also, Loughman v Flint Co., 132 AD2d 507, 510). On this record, and considering the well-recognized and potentially devastating health hazards posed to children by exposure to lead-based paint (see, Juarez v Wavecrest Mgt. Team, 88 NY2d 628, 640), we are not prepared to say that the hearing court should not have given credence to the evidence *490 presented, by the tenant’s highly qualified expert witness showing that a dangerous lead condition exists in the apartment occupied by tenant and her young child.
McCooe, J. (dissenting). I respectfully dissent. The grounds for reversal are that the tenant’s expert witness did not follow the proper lead testing procedure and the trial court refused to allow the landlord’s expert witnesses to testify as to the proper testing procedure. Specifically, the X-ray flourescence (XRF) testing procedure is flawed without a manual substrate correction to prevent false readings due to lead located in the substrate, which is the substance behind the paint such as pipes. The tenant’s expert’s position apparently was that it was not necessary to do this test since some types of substrate testing are done by the XRF machine.
The principal basis for the landlord’s argument that a manual substrate test was necessary were two reports of Federal Government agencies (HUD and EPA), one which specifically states that it is a necessary step in the accurate determination of lead paint testing. The tenant’s expert recognized the need to follow HUD’s “standard protocol.”
The court in its written decision considered a report in appellant’s posthearing memorandum from the EPA relating to XRF machines which reads in part: “in contrast to the Interim Guidelines and Scitec’s claims, substrate correction is in fact a necessary step in the accurate determination of the presence and amount of lead-based paint on surfaces.”
The decision of the trial court referred to both documents but did not directly address this issue. Rather, it referred to the margin of error testified to by the tenant’s expert allowed in the testing procedure and found his testimony “more convincing and compelling” that there was a lead paint violation in the apartment. The positive finding of lead was confined to two areas.
The landlord called two witnesses, Greene and Cassidy, who were employed by the firm testing for lead at the request of the landlord. Their testimony, in substance, was that the AA testing method found that there was no lead paint violation. The focus here is on their rejected expert testimony as to the procedures for the XRF testing employed by the tenant’s expert. Greene testified that he was an inspector/risk assessor and that his training included three four-year courses, one at Rutgers, one by the EPA and one by Westchester County. The training included the use of the Scitec XRF. His testimony on *491 its use was excluded by the court because “it was what he was told in the classroom” and “he never used the machine either.” (Record, at 223.) Cassidy testified he had comparable training in lead paint testing and is licensed in New Jersey (New York has no licensing) and that “he has the most advanced training you can receive in lead inspection at this time.” (Record, at 228.) He is also an instructor at Rutgers University in XRF technology. He testified that he was familiar with the Scitec XRF technology and its procedure and has operated it. His testimony as to the procedure for operating it was disallowed on the ground that he was not “certified” in its use.
Cumulatively the evidentiary errors require a reversal and mistrial since they affect a substantial right of the landlord. The dispositive issue is whether the tenant’s expert followed proper testing procedures and, if so, were the test results flawed so as to affect the positive finding. Federal agency directives require manual substrate testing and it was not done. Furthermore, the landlord’s witnesses sought to testify that proper testing requires manual substrate testing. The law is clear that the qualifications of an expert rests in the discretion of the Trial Judge, subject to review only if there is an error of law or abuse of discretion. (Meiselman v Crown Hgts. Hosp., 285 NY 389, 398-399.) Here there was an error of law in requiring a certification and abuse of discretion based upon the witnesses’ training as to the proper procedures to be followed. Their training and/or familiarity with the procedure qualified them to testify as experts on this narrow issue. (Ariola v Long, 197 AD2d 605, lv dismissed 82 NY2d 920.) The weight to be accorded their testimony was then a factor for the trier of the facts.
The tenant’s expert founded the testing company for which he testified which is now run by his son. He spends 60 or 70 hours a week during the summer consulting with this firm. The total record of the trial testimony was approximately 250 pages long and his testimony was approximately 200 pages where he lectured and theorized on his view of the law and lead testing. He testified that the AA test procedure used by the landlord “was more subject to misinterpretation” but that it was a “very sophisticated technique” and “more costly” and “more time consuming.” (Record, at 186.)
The dissent seeks to make three points. The first is that the issue as to the noncompliance with the Federal agency directives has not been addressed by the trial court. The second is that the tenant’s expert will continue to test and testify as to *492 the lack of need for manual testing substrate in spite of the directives. The third, and the most important point, is that these cases would not even arise if a city agency, housing or health, would do the testing. I am advised it costs less than $100 to perform the test and the city could then bill the landlord. The burden would then be on the party disputing the results to prove to the contrary.
The judgment should be reversed and a new trial directed.
Ostrau, P. J., and Davis, J., concur; McCooe, J., dissents in a separate memorandum.

 Paragraph (1) of section 27-2013 (h) provides: “The owner of a multiple dwelling shall remove or cover in a manner approved by the department any paint or other similar surfacecoating material having a reading of 0.7 milligrams of lead per square centimeter or greater or containing more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material on the interior walls, ceiling, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age and under reside.”