A.L. v New York City Hous. Auth. (2019 NY Slip Op 00702)





A.L. v New York City Hous. Auth.


2019 NY Slip Op 00702


Decided on January 31, 2019


Appellate Division, First Department


Moulton, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 31, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rosalyn H. Richter, J.P.
Sallie Manzanet-Daniels
Barbara R. Kapnick
Cynthia S. Kern
 Peter H. Moulton, JJ.


305654/11 7399 

[*1]A. L., etc., Plaintiff-Appellant,
v
New York City Housing Authority, Defendant-Respondent.



Plaintiff appeals from the order of the Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about February 17, 2017, which granted defendant's motion for summary judgment dismissing the complaint.




The Fitzgerald Law Firm, P.C., Yonkers (Mitchell Gittin, Deborah P. Henkin and Alberto Casadevall of counsel), for appellant.
Herzfeld & Rubin, P.C., New York (Linda M. Brown of counsel), for respondent.



MOULTON, J.


The presence of lead in paint is not evident to the naked eye. Detection comes by testing the paint itself or, inferentially, by testing the blood of people who have come in contact with paint chips or dust. Children are particularly vulnerable to lead-based paint "because of their normal hand-to-mouth activity and their developing neurological systems" (Matter of New York City Coalition to End Lead Poisoning v Vallone, 100 NY2d 337, 343 [2003]). There is no blanket requirement in New York State that a landlord test an apartment for lead-based paint based solely on the general knowledge of its dangers (see Chapman v Silber, 97 NY2d 9, 21 [2001]). Instead, the State has mandated that health care providers perform routine blood tests on young children in order to detect exposure.[FN1]
Plaintiff Helena C. (plaintiff) brings this appeal on behalf of her child A.L. after Supreme Court granted New York City Housing Authority's (NYCHA) motion for summary judgment dismissing her negligence complaint. The sole basis of the motion was NYCHA's contention that plaintiff's apartment did not contain a hazardous lead-based paint condition.
Supreme Court correctly found that the rebuttable presumption of Local Law No. 1 (1982) of City of New York (Local Law 1) did not apply because the subject building was not erected before January 1, 1960. However, Supreme Court erred in finding, as a matter of law, that NYCHA demonstrated that no hazardous condition existed in the apartment. Supreme Court also erred in finding that plaintiff failed to raise an issue of fact for trial.
Background
A.L. moved with his family into an apartment at NYCHA's Castle Hill Housing complex immediately after his birth in June 1999, and he has resided there ever since [FN2]. When he was 10 months old, a routine blood test at Lincoln Hospital's pediatric clinic revealed that he had a lead level of 4 ug/dL [FN3]. When he was two years old, a blood test revealed a level of lead of 7 ug/dL. On July 12, 2002, at three years of age, A.L. was diagnosed with lead poisoning as the result of a lead level of 10 ug/dL. Less than a year later, on March 27, 2003, the lead level in A.L.'s blood had increased to 16 ug/dL. His lead levels did not decrease to under 10 ug/dL until May 8, 2004. His last blood test was on July 19, 2005, and indicated a lead level of 6 ug/dL.
Plaintiff testified at her General Municipal Law § 50-h hearing and her deposition that she complained to NYCHA in person and by telephone about chipped and peeling paint in the apartment and flaking plaster caused by recurring leaks. She testified at her 50-h hearing that there was "[a] lot of flaking and falling on the floor. So I always had to keep sweeping it up. It was bad." She further testified that the windowsill "had a lot of chipping paint where the paint was like powder." At her deposition, plaintiff testified that chipped and peeling paint existed in [*2]all the rooms on interior doors, walls, windowsills, and the ceiling. At his deposition, NYCHA's representative, Thomas Sheil, similarly described observing chipped, peeling paint throughout the apartment during his inspections in 2002, 2003 and 2004. NYCHA's annual inspection reports from 2002 through 2004 indicate the presence of "Paint/Paint Chips" and the need for followup. NYCHA's records also reflect that the apartment was painted March 5-6, 2003.
Plaintiff also testified at her 50-h hearing that the apartment was inspected for lead-based paint either in 2002, after A.L. was diagnosed with a blood lead level of 10 mg/dL, or in 2003, after A.L's blood lead level rose to 16 mg/dL. She testified to a distinct memory of an "African woman who had washed the window" and used "chemicals to check to clean up for the lead paint around the window" and a "Caucasian or Spanish" man who used a "laser." Plaintiff testified that the workers told her that they were there to test for lead-based paint. She recalled that it was around "summertime" because the weather was nice. Plaintiff originally testified at her 50-h hearing that she did not "know if they were from the City" but she later testified at her deposition that "NYCHA came." Plaintiff testified that NYCHA never informed her of the testing results. NYCHA maintains that this inspection never occurred.
At her 50-h hearing, plaintiff further testified that NYCHA performed extensive repairs to her apartment sometime after that inspection. Plaintiff recalled "Mexican" contractors who "scraped the walls, and they put plastic on the floor, and they told me I had to step out with the baby, and they came and scraped the walls, and they painted over," and "they redid the apartment." She testified at her deposition that these repairs were made after A.L. was diagnosed with 16 ug/dL: "[T]hey made repairs. They come and take out the peeling paint and stuff like that." She explained at her deposition that the repairs included scraping and painting the radiator and the walls and ceilings in the bedroom, living room and bathroom. Plaintiff testified that NYCHA also replaced chipped, peeling doors, which is evidenced by a NYCHA June 17, 2004 work ticket for replacement of two bedroom doors and two closet doors.
The apartment was tested for lead-based paint on April 26, 2005 by Housing Environmental Services, Inc. (HES), a company retained by NYCHA. NYCHA does not explain why it hired HES to
test the apartment [FN4]. The report found no actionable level of lead-based paint in the apartment (the 2005 report).[FN5]
On October 17, 2008, the apartment was tested again at the request of plaintiff's counsel, who had been recently retained (the 2008 report). The tested surfaces did not contain actionable levels of lead-based paint.
Local Law 1 of 1982
Supreme Court correctly found that the rebuttable presumption of Local Law 1 did not apply because the subject building was not erected before January 1, 1960 [FN6]. Local Law 1 [*3]amended Administrative Code of City of NY § 27-2013 to add a new subdivision [h]. That subdivision included a presumption of lead content providing that:
"In any multiple dwelling erected prior to January 1, 1960 in which paint or other similar surface-coating material is found to be peeling on the interior walls, ceilings, doors, window sills or moldings in any dwelling unit in which a child or children six (6) years of age or under reside, it shall be presumed that the peeling substance contains more than 0.5 percent of metallic lead based on the non-volatile content of the paint or other similar surface-coating material or having a reading of 0.7 milligrams of lead per square
centimeter or greater" (Administrative Code former § 27-2013[h][2], repealed by Local Law No. 38 (1999) City of NY).[FN7]
Plaintiff argues that Supreme Court erred in concluding that the building was not erected before January 1, 1960. The term "erected" is not defined in the Local Law. Plaintiff contends that the legislature purposefully chose not to use such terms as "completed," "constructed" or "legally habitable." Instead, citing the definition of "erected" from the Dictionary of Construction, Surveying & Civil Engineering (Oxford University Press 2012) and from an online website, plaintiff asserts that Local Law 1 used the term "erected" to refer to the installation of a building's steel structure. Resort to legislative history would be improper, plaintiff contends, because Local Law 1 is clear on its face. The building's March 7, 1961 certificate of occupancy, plaintiff argues, has no bearing on when the building was erected. Instead, plaintiff points to the building's temporary certificate of occupancy dated October 26, 1959, issued for the "Boiler Room (Only)."
NYCHA counters that plaintiff's argument regarding the definition of "erected" should not be considered because it is a factual argument that was not raised before Supreme Court. If plaintiff had raised that argument, NYCHA explains that it would have submitted an affidavit by an engineer or architect to refute plaintiff's definition. NYCHA further points out that the painting of apartment interiors takes place long after the placement of a building's steel structure. The temporary certificate of occupancy is not probative, the agency asserts, because it was issued for the boiler room. Accordingly, in light of the date of the building's certificate of occupancy, NYCHA maintains that Supreme Court correctly found that Local Law 1 did not apply.
Plaintiff's argument is properly reached as a legal argument that appears on the face of the record and could not have been avoided if brought to the opposing party's attention (see Chateau D'If Corp. v City of New York, 219 AD2d 205, 209 [1st Dept 1996], lv denied 88 NY2d 811 [1996]).
Resort to legislative history is appropriate because the law does not define the term [*4]"erected," and it is necessary to determine the intent of the City Council. The construction industry's definition of the term "erected" is of no import. Notably, throughout the legislative history, the terms "built" and "erected" are used interchangeably (see generally NYLS Local Law Bill Jacket, Local Law No. 1 [1982] of City of New York). Indeed, we have used the term "constructed" in lieu of the term "erected" when discussing whether a building falls within the ambit of Local Law 1 (see Herrera v Persuad, 276 AD2d 304, 305 [1st Dept 2000]; Guzman v 560 Realty Co., 273 AD2d 25, 26 [1st Dept 2000]).
The legislative history also indicates that Local Law 1's pre-1960 date is tied to the date of New York City's ban on the use of lead paint (see Report of Comm on Housing and Buildings recommending the adoption of Local Law 1 [1982], 1982 NY City Legis Ann at 1; see also New York City Independent Budget Office, Preventing Lead Poisoning in Children, Fiscal Impact of Intro. 205, A Legislative Alternative to Local Law 1 at 2, April 28, 1999, NYLS Local Law Bill Jacket, Local Law No. 38 [1999] of City of New York)[FN8]. As NYCHA points out, the obvious purpose of Local Law 1 is to prevent lead poisoning. Lead poisoning can only occur when (or after) an apartment is painted. It cannot occur when a building's steel structure is erected. Thus, absent evidence that the apartment was painted earlier than March 7, 1961 (when the certificate of occupancy was issued), Supreme Court correctly concluded that Local Law 1 does not apply.
Hazardous Condition
While plaintiff is not entitled to the presumption of Local Law 1, that is not the end of the inquiry. We find that NYCHA failed to meet its burden on summary judgment to demonstrate that the apartment did not contain a hazardous level of lead-based paint.
NYCHA attempts to meet its burden by invoking the 2005 report [FN9]. The agency's reliance on that report is misplaced. The probative value of the 2005 report is dependent on NYCHA's unstated assumption that the lead condition of the apartment in 2005 was the same as the lead condition of the apartment three years earlier. This assumption, however, is not supported by any evidence (compare Tomaino v 209 E. 84th St. Corp., 72 AD3d 460, 461 [1st Dept 2010] [employees testified that the photographs taken two or three months after the accident accurately represented the condition on the date of the accident and therefore there was "no reason to believe that the condition of the treads changed significantly between the date of the accident and the date of plaintiff's return to the scene"]). NYCHA's assumption is particularly misplaced here, where plaintiff has brought forth evidence that 1) there were paint chips and dust in the apartment before 2003; 2) A.L. had elevated lead levels in 2002 and 2003; 3) an abatement went forward in 2003; and 4) A.L.'s levels went down after the alleged abatement.
Michaud v Lefferts 750, LLC (87 AD3d 990, 991-992 [2d Dept 2011]) illustrates that summary judgment may be granted based on apartment testing at or near the time of a lead poisoning diagnosis and that testing that occurs years later, and at a time when the child no longer has an elevated blood lead level, is not probative. In Michaud, the Second Department reversed the motion court for denying summary judgment to a landlord where the resident child [*5]was diagnosed with an elevated blood level in April 2004, and a September 2, 2004 test found no lead-based paint in the apartment. The Court held that the plaintiffs failed to raise an issue of fact based on apartment testing (finding actionable levels of lead-based paint) conducted two years and six months after the child's lead diagnosis and when the child no longer had an elevated blood lead level (id. at 992). Similarly, NYCHA's testing here is not probative, because it occurred nearly three years after A.L.'s lead poisoning diagnosis and at a time when A.L. no longer suffered from lead poisoning. The 2008 report is even more remote in time.[FN10]
Supreme Court also erred in finding that plaintiff failed to raise issues of fact, citing "counsel's speculation" and plaintiff's "conflicting" testimony. As the nonmovant, plaintiff is entitled to all reasonable inferences that can be drawn in her favor (see e.g. Melendez v Dorville, 93 AD3d 528, 528 [1st Dept 2012]). A plaintiff is generally not required to prove her claim (the plaintiff's ultimate burden) in order to defeat summary judgment (see Ferrante v American Lung Assn., 90 NY2d 623, 630 [1997]). At trial a plaintiff "need only prove that it was more likely' . . . or more reasonable' . . . that the alleged injury was caused by the defendant's negligence than by some other agency" (Gayle v City of New York, 92 NY2d 936, 937 [1998]).
Because "lead in paint is undetectable to the senses" (Chapman, 97 NY2d at 20) and because NYCHA did not test the apartment in 2002, no direct evidence exists regarding whether the apartment contained a hazardous level of lead-based paint at the relevant time - that of A.L.'s 2002 diagnosis. However, sufficient circumstantial evidence exists to raise an issue of fact for trial.
We have previously looked to whether a child's blood is elevated in determining whether a hazardous apartment condition exists. In Brown v Webb-Webber (161 AD3d 523 [1st Dept 2018]), we affirmed the motion court's grant of summary judgment to a third-party defendant owner who established that he was not liable for the resident child's lead poisoning because the child's "blood-lead levels were well within normal range" (161 AD3d 523, 524 [1st Dept 2018]). Even though the apartment in Brown had not been tested for lead-based paint while the child lived there, the owner satisfied his burden of proof by pointing to the child's low blood lead levels (see Brown v Webb-Weber, 2017 NY Slip Op 32074[U],*5-6 [Sup Ct, NY County 2017], affd 161 AD3d 523 [1st Dept 2018]).
Here, A.L.'s elevated blood lead level suggests that the reverse is true - a hazardous condition may have existed in the apartment during the relevant period. While there are other sources of lead poisoning, housing is a prime source (New York City Coalition to End Lead Poisoning v Koch, 138 Misc 2d 188, 189 n 1 [Sup Ct, NY County 1987] ["(l)ead-based paint on the interior surfaces of (children's) homes is a primary cause of the disease"], affd 139 AD2d 404 [1st Dept 1988]). At this point, other than the apartment, no other "more likely" or "more [*6]reasonable" source of A.L.'s injury exists (Gayle v City of New York, 92 NY2d at 937 [internal quotation marks omitted]).[FN11] The circumstantial evidence of a hazardous lead-based paint condition is also supported by an affirmation by Dr. Douglas B. Savino and an affidavit by lead paint expert William Savarese. Dr. Savino concluded that the apartment contained a hazardous level of lead-based paint, given the "chronology of the infant plaintiff's blood lead levels," which was "environmentally and temporally related to the infant plaintiff's residence." He noted that A.L.'s blood levels increased over time until he was diagnosed with 16 ug/dl on March 19, 2003, coinciding with the repainting of the apartment on March 5-6, 2003. Dr. Savino attributed the lead spike in A.L.'s blood to A.L. ingesting an excessive amount of lead dust. Dr. Savino further pointed out that A.L.'s blood lead levels declined gradually after the 2003 apartment repair and the 2004 removal of the chipped and peeling interior doors. William Savarese echoed Dr. Savino's statements and conclusions.
Contrary to NYCHA's position, plaintiff has also raised an issue of fact as to whether the abatement actually occurred. Supreme Court improperly discounted plaintiff's testimony as "conflicting." Any inconsistencies in a plaintiff's testimony present a credibility issue for the trier of fact (see Ferrante, 90 NY2d at 631 ["It is not the court's function on a motion for summary judgment to assess credibility"]). The agency is not more believable because it submitted "sworn affidavit proof by NYCHA that no such inspection or abatement occurred." Moreover, the agency's assertion is based on affidavits by Margarita Cabral and Tyrone Gordils. We cannot confirm that Cabral found no lead-based paint violations or an abatement for the apartment, because the second page of her affidavit is missing from both the appellate record and from Bronx County Clerk's Office online records. Nor can NYCHA rely on the Gordils affidavit, because it was improperly submitted to Supreme Court for the first time in reply and was based on a database search by unnamed "staff."
Accordingly, the order of the Supreme Court, Bronx County (Larry S. Schachner, J.), [*7]entered on or about February 17, 2017, which granted defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, and the motion denied.
All concur.
Order Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about February 17, 2017, reversed, on the law, without costs, and defendant's motion for summary judgment denied.
Opinion by Moulton, J. All concur.
Richter, J.P., Manzanet-Daniels, Kapnick, Kern, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 31, 2019
DEPUTY CLERK



Footnotes

Footnote 1:Pursuant to the State's Health Law (Public Health Law § 1370-a), the City enacted regulations requiring that health care providers test all children's blood for lead at age one (or earlier at routine well-child visits if the child is at least six months old) and again at age two (see 10 NYCRR 67-1.2). Further blood testing is required if the child is "at risk" or if the child has elevated blood lead levels (see New York State Department of Health website located at https://www.health.ny.gov/environmental/lead/health_care_providers/index.htm.

Footnote 2:Plaintiff testified that she left A.L. with her sister on the island of Dominica for four or five months in 2005-2006. However, that was more than three years after A.L.'s lead poisoning diagnosis. 

Footnote 3:New York City Health Code (24 RCNY 11.03) defines lead poisoning as a blood level of 10 micrograms per deciliter (ug/dL) or higher (see also 10 NYCRR 67-1.1[e]). The State's Health Law provides that the term "[e]levated lead levels" means "a blood lead level greater than or equal to ten micrograms of lead per deciliter of whole blood or such blood lead level as may be established by the department pursuant to rule or regulation" (Public Health Law § 1370[6]).

Footnote 4:NYCHA's appellate brief asserts that "NYCHA would not have any reason to test the alleged peeling paint," because the building was not built before January 1, 1960.

Footnote 5:The report found lead in the bathtub, bathroom sink and bathroom bend pipe. Plaintiff, however, does not claim that the bend pipe, the bathtub or bathroom sink caused A.L.'s injuries. 

Footnote 6:Plaintiff relies on Local Law No. 1 (1982) based on A.L.'s 2002 and 2003 elevated blood lead levels. Local Law No. 38 (1999) of City of New York (Local Law 38) replaced Local Law 1, but the Court of Appeals declared Local Law 38 null and void in 2003 (see Matter of New York City Coalition to End Lead Poisoning, 100 NY2d at 349-350 [Local Law 38 was declared null and void because the City failed to comply with SEQRA]). As a result, Local Law 1 was revived (id. at 350).

Footnote 7:The presumption was "unquestionably intended to protect a definite class of persons from a particular hazard they are incapable of avoiding themselves," but Local Law 1 did not create an additional standard of care (Juarez v Wavecrest Mgt. Team, 88 NY2d 628, 643-644 [1996]).

Footnote 8:Effective January 1, 1960, New York City banned the use of lead-based paint on interior building surfaces (see Juarez, 88 NY2d at 641; NY City Health Code [24 RCNY] § 173.13[c]).

Footnote 9:Supreme Court properly considered the 2005 report because, contrary to plaintiff's argument, the report was not hearsay. While NYCHA employee Margarita Cabral was not employed by the dissolved company HES, she properly authenticated the report as one of NYCHA's business records.

Footnote 10:Plaintiff also maintains that NYCHA failed to establish a prima facie entitlement to summary judgment under Chapman v Silber (97 NY2d 9 [2001]). Chapman is inapposite. The issue before the Court of Appeals was "[w]hat evidence of notice must a plaintiff-tenant in a lead paint poisoning case proffer in order to survive defendant-landlord's motion for summary judgment?" (id. at 15). Here, notice is not at issue. Instead, plaintiff unpersuasively cites Chapman to support a presumption that the apartment contained an actionable level of lead-based paint. However, because lead based-paint was found in the apartment in Chapman, the existence of a hazardous condition was never at issue (id. at 17).

Footnote 11:At plaintiff's 50-h hearing and deposition, NYCHA questioned plaintiff about potential alternative sources of lead exposure. Plaintiff testified that "Richard Green" preschool was the first "place" where she enrolled A.L. when he was approximately four years old. She testified that A.L. attended kindergarten and grade school at P.S. 138 when he was five years old. She also testified that her husband (who lived in the apartment from 2000-2005) worked as a construction "helper" repairing homes. However, plaintiff testified that she did not believe that A.L. was in preschool when he was diagnosed with lead poisoning at three years old. Moreover, although she laundered her husband's clothes at home, plaintiff testified that she did not know the materials with which her husband came into contact. Additionally, in response to NYCHA's questioning regarding whether anyone told plaintiff about other potential sources of A.L.'s lead exposure, she responded no. Thus, at this juncture, no alternative more likely or more reasonable explanation for A.L.'s lead poisoning exists (see Juarez, 88 NY2d at 648 ["defendant submitted speculative assertions by its attorney as to other possible sources of the lead poisoning," which was not competent proof to defeat plaintiff's motion for summary judgment under Local Law 1]).