■ DARIUS BYGRAVE, an Infant, by His Mother and Natural Guardian, AVERDEAN BYGRAVE, Appellant, v NEW YORK CITY HOUSING AUTHORITY, Respondent. [884 NYS2d 724]—

Order, Supreme Court, Bronx County (Betty Owen Stinson, J.), entered December 4, 2007, which, to the extent appealed from as limited by the briefs, granted defendant's motion for summary judgment dismissing the complaint, reversed, on the law, without costs, the motion denied and the complaint reinstated.

In February 1997, the infant plaintiff and his family moved into an apartment owned by defendant. He was 21 months old at the time. In November 1997, paint on the walls and ceiling of the apartment began to bubble and peel, and dust from the paint accumulated on the windowsills and baseboards. Plaintiff would often play with the paint bubbles and place his fingers in his mouth after they became covered with dust. Shortly after plaintiff first moved into the apartment, a blood test revealed that his blood contained four micrograms (µg) of lead per deciliter (dl). In September 1998, a blood test revealed that

plaintiff had a blood lead level of 10.4 µg/dl. Six weeks thereafter plaintiff's lead level rose to 12.6 µg/dl. Plaintiff's mother notified defendant that she believed her son had been poisoned by lead paint in the apartment. Defendant abated the lead paint condition in March 1999. Shortly before the abatement work began, the lead levels in plaintiff's blood began to decline. They never again exceeded 10 µg/dl.

In January 2000, the New York City Department of Education referred plaintiff for various evaluations to assess whether he qualified for preschool special education services. Plaintiff's mother had expressed concerns regarding his language and his fine motor and independent living skills, all of which appeared to her to be progressing normally until plaintiff began to ingest lead paint. A psychological evaluation determined that plaintiff had a "General Conceptual Ability" score in the low range. He was found to have some "mild autistic-like characteristics . . . which include . . . difficulty maintaining eye contact, difficulty relating meaningfully at times, repetitive speech, difficulty with language, unusual response to loud sounds, difficulty adapting to changes and unusual play." Physical and occupational therapy evaluations found plaintiff's gross and fine motor skills to be significantly delayed. A psychiatric evaluation resulted in a diagnosis of "PDDNOS[*] (perhaps secondary to lead exposure)." In early 2003, the Social Security Administration diagnosed plaintiff with autism and mental retardation.

Plaintiff commenced this action against defendant and in his bill of particulars alleged the following injuries from exposure to lead paint: "Plumbism, lead poisoning and its sequelae; Anemia; Elevated blood lead levels; Increased lead burden in blood and infant's body, causing developmental delays and brain damage; Cognitive deficits and learning difficulties; Loss of I.Q.; Behavioral irregularities; Anti-social behavior patterns; Developmental delays resulting in inability to fully interact and play with others; Difficulties in concentration, unfocused and shortened attention span, attention deficits; Necessity for extensive medical monitoring; Learning difficulties and impairment in ability to carry out responsibilities; Inability to participate in usual childhood activities; Language deficits and delay; Necessity for multiple and painful blood tests; Physical and mental pain, suffering, and anguish; Embarrassment and humiliation; Increased lead in bony formations; Elevated bone lead level; Sleep disorders; Visual disturbances; Hyperactivity; Lack of concentration; Memory Loss; Infant plaintiff has also

---

\* PDDNOS stands for pervasive developmental disorder (PDD) not otherwise specified.

suffered subclinical joint and connective tissue disease, disease of the immune system, kidney disease, hypertension and visual and auditory system processing deficits."

At the close of discovery, defendant moved for summary judgment. Its motion was primarily supported by the affidavit of Joseph Maytal, a pediatric neurologist who had performed a physical examination of plaintiff. In analyzing the effects of plaintiff's lead exposure, Dr. Maytal relied on a 1991 statement of the United States Centers for Disease Control (CDC) entitled Preventing Lead Poisoning in Young Children (Oct. 1991). The statement was intended to guide pediatric health care providers in how to react when confronted by blood lead levels over 10 μg/dl. It noted that "studies suggest that adverse effects of lead occur" (Preventing Lead Poisoning in Young Children, at 29) at levels over that threshold. Dr. Maytal explained that according to the CDC statement, children with blood levels between 10 μg/dl and 14 μg/dl are in a "border zone," and " '[t]he adverse effects of blood lead levels of 10-14 μg/dl are subtle and are not likely to be recognizable or measurable in the individual child.' "

Dr. Maytal further asserted that "it is my opinion, within a reasonable degree of medical certainty, that the infant plaintiff's impairments alleged in the Verified Bill of Particulars were not caused by the infant plaintiff's very slightly and very briefly elevated blood lead levels. The mere fact that [plaintiff's] lead level was documented to be minimally elevated does not mean that any of his problems are attributable to his blood lead level. Indeed, as reported by the CDC, the adverse effects of the blood lead levels measured in the infant plaintiff are subtle and not likely to be measurable." In addition, he quoted from an unattached report of an organization called the American Council on Science and Health (ASCH) entitled Lead and Human Health: An Update (2000). According to Dr. Maytal, that publication acknowledges that lead is capable of causing neurological effects at high doses, but states that "it is 'difficult if not impossible to attribute toxicologically significant behavioral or neurological effects to increasingly lower [blood lead levels] because of the numerous confounding factors that influence intelligence and development in children.' " These so-called "confounding factors," which Dr. Maytal related the article as identifying, "include 'socioeconomic status, childhood diseases, parenting skills, genetic predisposition . . . maternal and paternal intelligence . . . child abuse, nutrition and prenatal care, labor and delivery, and personality characteristics."

Finally, Dr. Maytal stated that: "It must be noted that there is absolutely no objective, empirical, scientific or medical report

or study which links minimally and briefly elevated blood lead levels to the development of autism or mental retardation. Nor is such a link recognized by the relevant medical or scientific communities. It is therefore my opinion, within a reasonable degree of medical certainty, that the infant plaintiff's minimally and briefly elevated blood lead levels did not contribute to the development of either his autism or mental retardation."

The motion court held that defendant met its burden of establishing prima facie entitlement to summary judgment through Dr. Maytal's affidavit. It further held that plaintiff did not present evidence in opposition sufficient to raise an issue of fact. The court found that plaintiff's evidence, including the affirmations and affidavits of three medical experts who had examined plaintiff, collectively did not, other than through "bald conclusions," demonstrate that plaintiff's injuries were caused, at least in part, by exposure to lead. This was fatal to plaintiff's case, the court stated, because "there are several possible causes for . . . plaintiff's deficits, for many of which the defendant is not responsible."

The court erred in awarding defendant summary judgment because defendant did not establish its prima facie entitlement to such relief. Dr. Maytal's opinion that plaintiff's lead exposure did not result in his injuries was based not on an individualized assessment of plaintiff's particular condition but rather on the CDC's statement that "[t]he adverse effects of blood lead levels of 10-14 µg/dl are subtle and are not likely to be recognizable or measurable in the individual child." (Preventing Lead Poisoning in Young Children, at 29.)

To bar plaintiff's claim on that basis would be to effectively declare that a child with blood lead levels in that range can never sue for damages and we decline to make such a far-reaching determination. First, such an approach would ignore the fact that the CDC statement expressly recognizes that there is a deleterious effect on the human body attributable to blood lead levels over 10 µg/dl. Second, the CDC statement did not state that a child can *never* exhibit ill effects as a result of blood lead levels between 10 to 14 µg/dl, only that it is "unlikely" that he or she would. It is worth noting that the CDC statement predates plaintiff's allegation of lead poisoning by 13 years. During this time, the ability of the medical community to recognize "the adverse effects of blood lead levels of 10-14 µg/dl" has presumably advanced. Finally, the New York City Health Code provides that "lead *poisoning* [is to be defined as] a blood lead level of 10 micrograms per deciliter or higher" (24 RCNY 11.03 [a] [emphasis added]). The term "poisoning" is generally

defined not merely as a person's exposure to a dangerous substance itself, but rather to an exposure that is likely to result in injury. For example, Merriam-Webster's Collegiate Dictionary (11th ed) defines "poison" as "a substance that through its chemical action usually kills, injures, or impairs an organism." Thus, the City of New York has determined that lead paint exposure which causes a child's blood lead level to rise above 10 µg/dl usually "injures" or "impairs" the child. To not recognize the possibility that plaintiff's injuries in this case were caused by lead paint exposure would be at odds with that determination.

Because the CDC statement is insufficient to generally bar all personal injury claims by children with blood lead levels between 10 and 14 µg/dl, defendant was required to establish that in this particular case there was no causal link between the specific injuries alleged in plaintiff's bill of particulars and his lead paint exposure. Defendant failed to do this through Dr. Maytal's affidavit, because Dr. Maytal offered only the conclusory statement, without any scientific evidentiary support, that "plaintiff's impairments . . . were not caused by . . . 'border zone' blood lead levels" (see Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). A detailed explanation of why plaintiff's alleged injuries in this case could not have been related to lead paint exposure was required to shift the burden to plaintiff.

Nor does reliance on the ASCH report avail defendant. Dr. Maytal did not state whether that report identifies at what blood lead levels it becomes "difficult if not impossible" to discern between "toxicologically significant behavioral or neurological effects" and "the numerous confounding factors that influence intelligence and development in children." In addition, Dr. Maytal failed to establish that autism, mental retardation or one of the other so called "confounding factors" cited in the ASCH report was far more likely than lead poisoning to have caused plaintiff's symptoms.

Indeed, Dr. Maytal's focus on plaintiff's autism and mental retardation did not assist defendant in meeting its prima facie burden, because plaintiff's bill of particulars does not allege those injuries. Even if some of plaintiff's symptoms are attributable to his autism and mental retardation, the burden was on defendant, in the first instance, to explain why none of the injuries alleged in plaintiff's bill of particulars could have been the result of lead poisoning, as opposed to those ailments. Nowhere in his affidavit did Dr. Maytal state that it is impossible to separate the effects of autism and mental retardation

from the effects of lead exposure such that no jury could possibly award damages for the latter notwithstanding the existence of the former. Similarly, Dr. Maytal did not address the possibility that the lead exposure exacerbated those symptoms which were initially caused by autism or mental retardation.

This is not to say that blood lead levels of 10 to 14 µg/dl will *always* give rise to a suit for damages. A plaintiff must still prove that he or she developed physical symptoms as a result of having been exposed to lead paint. For example, in *Veloz v Refika Realty Co.* (38 AD3d 299 [2007]), the plaintiff alleged very mild cognitive deficits which the defendant challenged as not being generally recognized as ordinary sequelae of lead poisoning. This Court affirmed a grant of summary judgment dismissing the complaint, stating that "[t]hrough its expert's affirmation, the owner established its entitlement to summary judgment on the ground that the infant plaintiff did not suffer any physical or cognitive injuries stemming from the alleged lead poisoning, thus shifting the burden to plaintiffs to raise an issue of fact" (38 AD3d at 300). In that case, the plaintiff did not raise an issue of fact because his expert's affirmation "fail[ed] to support either the general proposition that early exposure to lead results in such impairments or his specific conclusion that plaintiff's early exposure resulted in the impairments he saw" (*id.*). Here, in contrast to *Veloz*, plaintiff is not alleging injuries which have never before been recognized as being caused by lead paint exposure. To the contrary, there is nothing novel in the theory that lead paint exposure causes cognitive deficits. Accordingly, defendant was required to establish by other than conclusory statements that those deficits were not caused by the lead paint exposure.

Because defendant failed to meet its initial burden of establishing entitlement to judgment in its favor as a matter of law, the motion court should have denied the motion for summary judgment without even considering the sufficiency of plaintiff's opposition papers (*see Winegrad*, 64 NY2d at 853). Even if we were to find that defendant shifted the burden, however, we would find that plaintiff submitted sufficient evidence to raise an issue of fact. Plaintiff's three medical experts collectively presented numerous scientific articles concluding that exposure to lead paint which results in blood lead levels of even less than 10 µg/dl can cause demonstrable injuries. This directly contradicted Dr. Maytal's opinion. Additionally, all three experts opined that, to a reasonable degree of medical certainty, the symptoms they observed in plaintiff were causally related to his lead poisoning, and were separate injuries from his autism and mental retardation.

Finally, since plaintiff's opposition is academic, we need not decide whether the motion court should have refused to consider plaintiff's experts' affidavits and affirmations on the ground that plaintiff allegedly failed to disclose those experts in a timely fashion pursuant to CPLR 3101 (d) (1) (i). Concur—Gonzalez, P.J., Mazzarelli, Renwick and Abdus-Salaam, JJ.

Buckley, J., concurs in a separate memorandum as follows: I would find that defendant met its initial burden of establishing entitlement to summary judgment, although I agree that plaintiff's opposition was sufficient to create a triable issue of fact.

Plaintiff was approximately 21 months old when he and his family moved into an apartment owned by defendant. Three months later, on May 13, 1997, plaintiff's lead paint blood test revealed four micrograms of lead per deciliter of blood (g/dl). Testing thereafter revealed: 10.4 g/dl on September 19, 1998; 12.6 g/dl on November 30, 1998; 9 g/dl on January 27, 1999; 8 g/dl on May 1, 1999; under 3 g/dl on November 3, 1999; 7 g/dl on January 22, 2001; under 3 g/dl on December 12, 2001; 6 g/dl on June 29, 2002; 3 g/dl on February 13, 2005.

According to a 1991 publication by the Centers for Disease Control (CDC), relied on by defendant's pediatric neurologist, Dr. Joseph Maytal, blood lead levels of less than 10 g/dl are "not considered to be indicative of lead poisoning." (Preventing Lead Poisoning in Young Children, at 29 [Oct. 1991].) Levels of 10 to 14 g/dl are "in a border zone," in which the adverse effects "are subtle and are not likely to be recognizable or measurable in the individual child"; moreover, the report indicates that "[s]ince the laboratory tests for measuring blood lead levels are not as accurate and precise as we would like them to be *at these levels,* many of these children's blood lead levels may, in fact, be <10 g/dl" (*id.* [emphasis added]). Children with levels of 15 to 19 g/dl are "at risk for decreases in IQ of up to several IQ points and other subtle effects" and "should receive followup testing." (*Id.* at 29-30.) Children with levels of 20 to 69 g/dl "should have a full medical evaluation," and those with levels of 70 g/dl or greater "constitute a medical emergency." (*Id.* at 30.) Thus, according to plaintiff's medical records, he had a blood level in the "border zone" for at most four months, after which it declined to levels not indicative of poisoning.

Dr. Maytal also relied on an American Council on Science and Health (ACSH) 2000 report titled Lead and Human Health: An Update, which states that it is "difficult if not impossible to attribute toxicologically significant behavioral or neurological effects to increasingly lower [blood lead levels] because of the

numerous confounding factors that influence intelligence and development in children" (at 50), including "socioeconomic status, childhood diseases, parenting skills, genetic predisposition . . . , maternal and paternal intelligence . . . , child abuse, nutrition and prenatal care, labor and delivery, and personality characteristics" (at 15-16.)

Based on his examination of plaintiff, interview with plaintiff's mother, review of the medical and school records, medical experience, and use of the CDC and ACSH reports, Dr. Maytal opined, with a reasonable degree of medical certainty, that "the infant plaintiff's impairments alleged in the Verified Bill of Particulars were not caused by the infant plaintiff's very slightly and very briefly elevated blood lead levels."

Dr. Maytal's scientifically supported opinion was sufficient to establish defendant's prima facie entitlement to summary judgment on the issue of causation (*see Diamond v Di Luzio*, 22 AD3d 517 [2005]). Contrary to the majority's assertion, neither Dr. Maytal's opinion nor the CDC report compels a determination that no child with blood lead levels within the "border zone" can ever recover from exposure to lead. Dr. Maytal merely testified that plaintiff's very brief and moderate level within the "border zone," which subsequently decreased, did not support a finding that plaintiff's particular conditions were caused by lead. Nor can Dr. Maytal be faulted for failing to refute the "presum[ed] advance[s]" in blood testing techniques hypothesized by the majority. Nevertheless, the majority seems to suggest that because it is generally accepted that lead can cause cognitive deficiencies, it was defendant's burden, in the first instance, to present a medical opinion far exceeding reasonable medical certainty, and more approximating absolute conviction, that lead was not the cause of any of plaintiff's claimed injuries.

Although defendant met its initial burden on the summary judgment motion, the testimony of plaintiff's experts was sufficient to raise an issue of fact at least as to whether some of plaintiff's conditions were exacerbated by exposure to lead. However, I depart from the majority in noting that most of the scientific articles relied on by plaintiff's experts are of little or no relevance.

For example, an article published in the Journal of Applied Research in 2005 (vol 5 [No. 1], at 80) by Lidsky et al., titled *Autism and Autistic Symptoms Associated with Childhood Lead Poisoning*, concerned a study of two children. The first child's blood lead level exceeded 50 g/dl, and elevated levels persisted for at least 26 months; the second child's blood lead level peaked at 110 g/dl, and elevated levels continued for at least five years.

Thus, both children in that study had blood lead levels that far exceeded plaintiff's in both severity and duration.

Another article, by Lanphear et al., *Cognitive Deficits Associated with Blood Lead Concentrations <10 g/dl in US Children and Adolescents*, published in Public Health Reports in 2000 (vol 115 [No. 6], at 521, 526), "suggest[ed] that cognitive deficits are associated with blood lead concentrations lower than 5 g/dl." The ambiguous conclusions of "suggest" and "associated" were further diluted by the report's concession that the absence of an adjustment for such variables as home environment and maternal intelligence "may have resulted in . . . overestimating the detrimental effects of lead." (*Id.* at 527.)

Another study, by Canfield et al., *Intellectual Impairment in Children with Blood Lead Concentrations below 10 g per Deciliter*, published in the New England Journal of Medicine in 2003 (vol 348 [No. 16], at 1517, 1525), merely produced results that "suggest that children with blood lead concentrations below 10 g per deciliter merit more intensive investigation."