## D.V. v 997 Hart St., LLC

2024 NY Slip Op 33166(U)

September 10, 2024

Supreme Court, Kings County

Docket Number: Index No. 526413/2019

Judge: Kerry J. Ward

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part 9 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 10th day of September, 2024.

PRESENT:

HON. KERRY J. WARD,
　　　　　　　　　　　　Justice.

-------------------------------------------------------------------X

D.V., an Infant by his Mother and Natural Guardian, SOLANGEL BAUTISTA, and SOLANGEL BAUTISTA, Individually,

　　　　　　　　　　　　　　　　　　Plaintiffs,

　　　　-against-

997 HART STREET, LLC,

　　　　　　　　　　　　　　　　　　Defendant.

-------------------------------------------------------------------X

Index No.: 526413/2019

Mot. Seq. No. 4

| The following e-filed papers read herein: | NYSCEF Doc Nos.: |
|---|---|
| Notice of Motion/Order to Show Cause/ Petition/Cross Motion and Affidavits (Affirmations) Annexed | 42-64 |
| Opposing Affidavits (Affirmations) | 69, 71-76 |
| Affidavits/Affirmations in Reply | 78-83 |
| Plaintiff's Memorandum of Law | 65 |
| Defendant's Memorandum of Law | 70 |

Upon the foregoing papers, in this action by the infant plaintiff D.V.,[1] brought on his behalf by his mother and natural guardian, Solangel Bautista (plaintiff), and by plaintiff, individually, against defendant 997 Hart Street, LLC (defendant), to recover damages for injuries sustained due to D.V.'s exposure and ingestion of lead-based paint, plaintiffs

_____

[1] The child's name has been redacted in accordance with 22 NYCRR 202.5 (e) (1) (iii).

[* 1]

move, under motion sequence number four, for an order granting them summary judgment on the issue of liability against defendant.

## Facts and Procedural Background

The premises located at 997 Hart Street, Brooklyn, New York, is a two-family house, which was built in the 1930s (NYSCEF Doc No. 52). On June 1, 2018, plaintiff, who was then pregnant, signed a lease with Nateram Ramkissoon (Ramkissoon), who was, at that time, the owner and landlord of the premises, to rent apartment 2, which consisted of the second floor of the premises (NYSCEF Doc No. 64). Ramkissoon occupied the first floor apartment at that time. Apartment 2 has three bedrooms, a kitchen, and a bathroom. Upon signing the lease, plaintiff moved into apartment 2 with her mother, D.V.'s father, and her son, K.D., who was then two years old. Approximately, three months later, on September 15, 2018, D.V. was born and immediately became an additional resident of the apartment.

Approximately two months after D.V. was born, Ramkissoon, by a deed dated December 11, 2018, sold the premises to defendant (NYSCEF Doc No. 53). Plaintiff claims that defendant's property manager, Joanna Moloney (Moloney), came "[a] number of times" to see the apartment, and, therefore, was aware that a child resided in the apartment (NYSCEF Doc No. 48, plaintiff's dep tr at 41, line 25).

After defendant purchased the property, Martha Garcia (Garcia) became the superintendent of the premises. Garcia would go to the building twice a week to take out the garbage and clean the property (NYSCEF Doc No. 49, Moloney's dep tr at 48-49). Plaintiff would make any complaints she and her family had regarding the condition of the

2

apartment to Garcia, who would inform Moloney about these complaints (NYSCEF Doc No. 48, plaintiff's dep tr at 46, lines 22-25; at 47, lines 1-9)

According to plaintiff, the paint in the apartment was in "bad condition," and in February or March 2019, two or three months after defendant purchased the apartment, she complained to Garcia that the paint was chipping in the apartment (*id.* at 47, lines 19-22; at 48, lines 4, 18-20). Plaintiff described the size of the paint chips as being approximately one-half of an inch (*id.* at 51, line 10).

On June 14, 2019, when D.V. was approximately nine months old, a lead test revealed that he had an elevated blood lead level[2] of 5 ug/dL.[3] On June 26, 2019, the New York City Department of Health and Mental Hygiene Healthy Homes Program/Lead Poisoning Prevention Program (the DOH) inspected the apartment for lead-based paint pursuant to section 173.13 (d) (1) of the New York City Health Code. The inspection report stated that 30 of the 62 XRF readings returned positive results for lead-based paint hazards (NYSCEF Doc No. 55).

According to Moloney, she learned about violations against the property in late June or July 2019 via email from an alert service subscribed to by defendant that alerted defendant to violations as to missing window guards and a missing smoke detector.

---

[2] Effective April 12, 2019, Public Health Law § 1370 (6) was amended to define an elevated lead level as meaning "a blood lead level greater than or equal to five micrograms of lead per deciliter of whole blood or such lower blood lead level as may be established by the department pursuant to rule or regulation." Prior to that amendment, an elevated lead level was defined as meaning "a blood lead level greater than or equal to ten micrograms of lead per deciliter of whole blood or such lower blood lead level as may be established by the department pursuant to rule or regulation." 10 NYCRR 67-1.1 (e) similarly, as amended in 2019, provides that "[e]levated blood lead level means a blood lead concentration equal to or greater than five micrograms per deciliter of whole blood."

[3] Ug/dL stands for micrograms of lead per deciliter of whole blood.

3

[* 3]

Moloney sent Garcia and her handyman Kenny to the building. When Garcia and Kenny went to plaintiff's apartment, they observed stamps on the walls that stated, "lead paint" and Garcia told Moloney about these stamps (NYSCEF Doc No. 49, Moloney's dep tr at 107, lines 4-16; at 108, lines 7-8). On July 3, 2019, defendant sent a letter to plaintiff requesting access to the apartment so that they could have a lead abatement company look at the apartment and provide a proposal for the remediation (id. at 123, lines 3-5; at 126, lines 2-4).

On July 26, 2019, the DOH issued an Order to Abate Nuisance to defendant (NYSCEF Doc No. 56). The Order to Abate Nuisance was addressed to defendant and dated July 26, 2019 (id.). The Order to Abate Nuisance stated that a DOH inspection on June 26, 2019 determined that the dwelling unit contained lead-based paint that was peeling and/or located on one or more window friction or other surfaces that the DOH had determined to be a lead hazard because of its concentration, condition, location, and/or accessibility to children (id.). The Order to Abate Nuisance further stated that the lead-based paint hazard(s) identified in the Violation Report appended to this Order to Abate Nuisance constituted a nuisance pursuant to the Administrative Code of the City of New York § 17-142 (id.). The Order to Abate Nuisance directed defendant, pursuant to Administrative Code §§ 17-113, 17-114, and 17-141 through 17-158, and New York City Health Code §§ 3.01, 3.07, 3.09, and 173.13 (d) (1), to remove, correct, and/or otherwise abate the lead-based paint violations noted in the appended Violation Report in accordance with the procedures prescribed in New York City Health Code § 173.14 and to complete all abatement work within five days of receipt of this Order (id.).

4

[* 4]

Defendant did not complete the abatement work within five days of receipt of the Order to Abate Nuisance. Moloney asserts that she was personally served with the Order to Abate Nuisance on August 1, 2019.

By a letter dated August 1, 2019, Moloney requested that plaintiff contact her or Garcia immediately in order to schedule several access dates, both for an inspection and to complete the repairs necessary to remove the lead paint (NYSCEF Doc No. 49, August 1, 2019 letter). Moloney did not take immediate action to have the abatement work performed. Moloney did not remember if she started looking for a contractor during August or September 2019 (NYSCEF Doc No. 49, Moloney's dep tr at 133, lines 12-16). Moloney obtained access to the apartment and walked through it with a lead-paint remediation contractor, but did not hire him because his proposal "came in a little bit high" (*id.* at 134, lines 15-16).

An August 9, 2019 letter to defendant (NYSCEF Doc No. 58) stated that review of records of the DOH Healthy Homes Program indicated that defendant was served with the Order of the Commissioner of Health to abate lead-based paint and that pursuant to New York City Health Code § 173.14 (C) (I) (A), defendant had not filed with the Lead Poisoning Prevention Program notification of starting lead abatement. This letter further provided that notification must be filed no less than 24 hours and no more than 96 hours before starting abatement, using the form enclosed with the Order, and it enclosed another form for defendant's convenience (*id.*).

An August 21, 2019 final notice (NYSCEF Doc No. 59) was sent to defendant, which stated that an inspection by the DOH's Healthy Homes Program and a review of its

5

[* 5]

records indicated that the lead paint hazards cited at the premises had not been abated or contested. It provided that in accordance with New York City Health Code § 173.13 (d) (4), the DOH was requesting the Department of Housing Preservation and Development (HPD) to execute the Order. It set forth that the failure to comply with this Order will result in placement of a lien and may subject defendant to civil or criminal penalties. The DOH scheduled the work itself, which was performed by HPD, and billed to defendant (NYSCEF Doc No. 49, Moloney's dep tr at 138, lines 3-25; at 139, line 2).

On or about September 10, 2019, Moloney eventually hired BNH Lead Examiner,[4] a lead paint abatement contractor, to perform the abatement work (NYSCEF Doc No. 60; NYSCEF Doc No. 49, Moloney's dep tr at 134, lines 4-5; at 137, lines 16-22). However, by the time that BNH Lead Examiner came to perform the work in plaintiffs' apartment on September 11, 2019, over six weeks from the issuance of the July 26, 2019 Order to Abate Nuisance, Moloney learned that the work had already been performed by HPD because defendant had taken too long to schedule the work (NYSCEF Doc No. 49, Moloney's dep tr at 138, line 25; at 139, line 2).

In addition to not timely abating the hazardous lead condition in accordance with the Order to Abate Nuisance, defendant did not offer to relocate plaintiff and her family, including D.V. As a result, D.V. remained in the apartment, which continued to contain lead, for over six more weeks while the lead paint hazard was not ameliorated and during

---

[4] The Notification of Commencement of Lead Abatement/Remediation is dated September 10, 2019 and actually lists Certified Environmental as the EPA Contractor, BMH Lead Examiner as the dust testing company, and Enviro-Prober as the Laboratory for Sample Analysis (NYSCEF Doc No. 60).

6

[* 6]

which time the lead abatement work was actively being performed by HPD, resulting in D.V.'s further exposure to the lead condition in the apartment.

D.V.'s blood lead level increased dramatically when defendant failed to remediate the lead-based hazards within five days from July 26, 2019 as required by the Order to Abate Nuisance. A September 26, 2019 lead test revealed that D.V. had an increased blood lead level of 10 ug/dL, which was double the amount found on June 14, 2019 (NYSCEF Doc No. 54, DOH records; NYSCEF Doc No. 51, D.V.'s medical records). After the DOH had abated the dangerous lead paint condition, a November 4, 2019 lead test recorded that D.V.'s blood lead level decreased to 8 ug/dL, which was still elevated (NYSCEF Doc No. 51, D.V.'s medical records). A May 28, 2020 lead test revealed that D.V.'s blood lead level had decreased to 4 ug/dL (*id.*). A September 29, 2021 lead test showed that D.V.'s blood lead level was 2 ug/dL, and an October 24, 2022 lead test showed that D.V.'s blood lead level was only 1 ug/dL (*id.*). At some point in 2019, defendant listed the building for sale.

By a letter dated December 13, 2019 (NYSCEF Doc No. 49, December 13, 2019 letter), Moloney informed the DOH that she had taken steps to coordinate the removal of lead paint dust described in the Order to Abate Nuisance. Specifically, Moloney stated that cleaning was conducted of all surfaces referenced with a HEPA vacuum, followed by washing with a detergent solution, and a final HEPA vacuuming on December 10, 2019. In addition, Moloney informed the DOH that a third-party lead-based paint inspector was hired in order to collect dust samples, which was completed on December 11, 2019. Moloney enclosed a report provided to her by Enviro-test Inc., who conducted the dust wipe sampling.

7

[* 7]

By a letter dated January 10, 2020 (NYSCEF Doc No. 49, January 10, 2020 letter), the DOH informed Moloney that the violations in the Commissioner's Order to Abate Nuisance were corrected, and that acceptable dust wipe clearance test results were received. According to plaintiff, she and her family vacated the apartment in September 2019 (NYSCEF Doc No. 47 at paragraph 5) or in 2020 (NYSCEF Doc No. 48, plaintiff's dep tr at 11, lines 19-20). Defendant, on the other hand, claims that plaintiff and her family vacated the apartment in September 2020 (NYSCEF Doc No. 69 at paragraph 16) or February 2021 (NYSCEF Doc No. 49, Moloney's dep tr at 195, line 6).

On December 4, 2019, plaintiffs filed the instant action against defendant (NYSCEF Doc No. 1). Plaintiffs' complaint alleges claims of negligence and violation of the Administrative Code of the City of New York, and a loss of services claim on behalf of plaintiff. On May 19, 2020, defendant filed an answer to plaintiffs' complaint (NYSCEF Doc No. 4). On November 29, 2023, plaintiffs filed their instant motion, under motion sequence number four (NYSCEF Doc No. 42). Defendant has submitted opposition papers, and plaintiffs have submitted reply papers. All discovery has been completed, including the depositions of plaintiff and Moloney. Plaintiffs filed their note of issue on March 7, 2024 (NYSCEF Doc No. 67).

## Discussion

Local Law 1, applicable in the City of New York, "requires that the owner of a multiple dwelling remove or cover paint containing specified hazardous levels of lead in any apartment in which a child six years of age or younger resides" (*Shafi v Motta*, 73 AD3d 729, 729 [2d Dept 2010]; *see also* Administrative Code of City of NY § 27-2056.3,

8

§ 27-2056.18; *Juarez v Wavecrest Mgt. Team*, 88 NY2d 628, 641-642 [1996]; *LM v New York City Hous. Auth.*, 171 AD3d 1154, 1154-1155 [2d Dept 2019]; *Turner v Davis*, 105 AD3d 946, 947 [2d Dept 2013]; *O'Neal v New York City Hous. Auth.*, 4 AD3d 348, 349 [2d Dept 2004]). "Violation of Local Law 1, however, does not result in absolute liability for injuries caused by exposure to lead" (*Shafi*, 73 AD3d at 729; *see also Juarez*, 88 NY2d at 643). "Rather, a plaintiff must establish that the landlord had actual or constructive notice of the condition for a period of time such that, in the exercise of reasonable care, the condition should have been remedied" (*Shafi*, 73 AD3d at 729-730; *see also Juarez*, 88 NY2d at 646).

Administrative Code § 27-2056.5 (a), part of Local Law 1, provides that "[i]n any multiple dwelling erected prior to January 1, 1960, it *shall be presumed* that the paint or other similar surface-coating material in any dwelling unit where a child of applicable age resides or in the common areas is lead-based paint" (emphasis added; *see Juarez*, 88 NY2d at 642; *Turner*, 105 AD3d at 947). Applying this presumption, the landlord will be charged with constructive notice of any lead paint hazard within an apartment that he or she knows is occupied by a child of the specified age (*Juarez*, 88 NY2d at 647; *Hill v Lorac House, Inc.*, 135 AD3d 659, 659 [1st Dept 2016]; *Turner*, 105 AD3d at 947; *Shafi*, 73 AD3d 729, 729-730 [2d Dept 2010]; *Jiminez v City of New York*, 7 AD3d 268, 269 [1st Dept 2004]; *Chadwick v Sabin*, 304 AD2d 603, 603-604 [2d Dept 2003]; *Woolfalk v New York City Hous. Auth.*, 263 AD2d 355, 355-356 [1st Dept 1999], *lv denied* 4 NY3d 711 [2005]; *Rivas v 1340 Hudson Realty Corp.*, 234 AD2d 132, 135 [1st Dept 1996]; *Colon v New York City Hous. Auth.*, 233 AD2d 123, 123 [1st Dept 1996]). Thus, under Local Law 1, "whether the

9

landlord had actual notice of peeling paint or other indications of a [lead paint] hazard are immaterial" (*Woolfalk*, 263 AD2d at 356; *see also Hill*, 135 AD3d at 659).

Local Law 29 of 2020, which was approved on February 11, 2020 and became effective on February 10, 2021, made Local Law 1 applicable to owners of one- and two-family rental properties. Specifically, Administrative Code § 27-2056.1 provides as follows:

> "For the purposes of this article, the term 'multiple dwelling' includes a private dwelling where at least one dwelling unit within such dwelling is occupied by persons other than the owner of such dwelling or a member of such owner's family, provided, however, that the provisions of this article, other than section 27-2056.14, shall not apply to a dwelling unit that is occupied by such owner or a member of such owner's family."

At the time that D.V. was living at the premises and lead paint violations existed in 2019, Administrative Code § 27-2056.1 was not yet in effect. Rather, a two-family house was not considered to be a multiple dwelling and, therefore, Local Law 1 was inapplicable to it (*see Netral v Lippold*, 304 AD2d 491, 492 [1st Dept 2003]). Note 2 to Administrative Code § 27-2056.1 states that "[t]his local law takes effect 1 year after it becomes law, except the commissioner of housing preservation and development may take such actions as are necessary for implementation, including the promulgation of rules, before such effective date."[5] Thus, Administrative Code § 27-2056.1 took effect on February 10, 2021.

---

[5] "HPD expanded its enforcement work through the implementation of Local Law 29 of 2020, which made Local Law 1 applicable to owners of one- and two-family rental properties" (https://www.nyc.gov/assets/hpd/downloads/pdfs/services/local-law-1-report-fy2021.pdf at 1). Beginning on July 1, 2020, prior to when Local Law 29 of 2020 went into effect on February 10, 2021, "HPD began to enforce Local Law 1 requirements regarding lead-based paint hazards in one- and two-family homes pursuant to Local Law 29 of 2020" (*id*. at 4). HPD, in partnership with LeadFreeNYC, launched the "Get Ahead of Lead" campaign in November 2019 for multiple dwelling properties and continued it in early 2020 with a particular focus on one- and two-family properties" (*id*. at 2). "This outreach and education campaign reminded property owners of their obligation under the law to proactively address lead-based paint hazards" (*id*.). "The campaign ran in eight languages on bus

10

Plaintiffs argue that the court should apply this provision retroactively so that Local Law 1 is applicable to the premises and defendant. The court notes the remedial purpose of this provision. Furthermore, in *Matter of Regina Metro, Co., LLC v New York State Div. of Hous. & Community Renewal* (35 NY3d 332, 378 [2020], *rearg denied* 35 NY3d 1079 [2020] and 35 NY3d 1081[2020]), the Court of Appeals noted that "where retroactivity is integral to full achievement of the fundamental purpose of the legislation, a rational basis for the retroactive effect may be readily identifiable."

However, the general rule is that "an amendment will have prospective application only, and will have no retroactive effect, unless its language clearly indicates that it shall receive a contrary interpretation" (McKinney's Cons Laws of NY, Book 1, Statutes § 52 [footnotes omitted]). Since Administrative Code § 27-2056.1 provides a specific effective date and its effective date was postponed by one year from the time of its enactment, this militates against retroactivity (*see Matter of Elhannon Wholesale Nursery, Inc. [Commissioner of Labor]*, 225 AD3d 948, 950 [3d Dept 2024]). Furthermore, since Administrative Code § 27-2056.1 was not in effect until February 10, 2021, it would be fundamentally unfair to hold defendant liable under this provision since it did not exist and Local Law 1 was inapplicable to defendant at the time of D.V.'s lead poisoning. Thus, the court finds that Administrative Code § 27-2056.1 is not retroactive and Local Law 1 does not apply in this case (*see O'Connor v Weiss*, 18 Misc 3d 1124[A], 2008 NY Slip Op 50191[U], *7 [Sup Ct, Kings County 2008]).

---

shelters, subway ads, storefronts, newspapers, and social media in 19 zip codes with high rates of children with elevated blood lead levels (*id.*).

While plaintiffs are not entitled to the presumption of Local Law 1, that is not the end of the inquiry. Where certain requisites are satisfied, a landlord still may be liable for negligence under traditional common-law principles. Under New York common law, a landowner has a duty to maintain his or her premises in a reasonably safe condition (*see Basso v Miller*, 40 NY2d 233, 241 [1976]; *Greene v Mullen*, 127 AD3d 696, 697 [2d Dept 2015]). "[I]n order for a landlord to be held liable for injuries resulting from a defective condition upon the premises, the plaintiff must establish that the landlord had actual or constructive notice of the condition for such a period of time that, in the exercise of reasonable care, it should have been corrected" (*Juarez*, 88 NY2d at 646; *see also Greene*, 127 AD3d at 697; *Alonso v Coutinho Enters., LLC*, 35 AD3d 641, 641 [2d Dept 2006]).

"In order '[t]o establish that a landlord is liable for a lead-paint condition, a plaintiff must demonstrate that the landlord had actual or constructive notice of, and a reasonable opportunity to remedy, the hazardous condition'" (*Wood v Giordano*, 128 AD3d 1488, 1489 [4th Dept 2015], quoting *Rodriguez v Trakansook*, 67 AD3d 768, 768-769 [2d Dept 2009]; *see also Alonso*, 35 AD3d at 641). Where there is no evidence that the landlord had actual notice of the lead paint hazardous condition, plaintiffs may establish that the landlord had constructive notice of such condition by demonstrating that the landlord "(1) retained a right of entry to the premises and assumed a duty to make repairs, (2) knew that the apartment was constructed at a time before lead-based interior paint was banned, (3) was aware that paint was peeling on the premises, (4) knew of the hazards of lead-based paint to young children, and (5) knew that a young child lived in the apartment" (*Chapman v Silber*, 97 NY2d 9, 15 [2001]; *see also Rodrigues v Lesser*, 150 AD3d 1686, 1687 [4th

12

[* 12]

Dept 2017]; *Wood*, 128 AD3d at 1489; *Greene*, 127 AD3d at 697; *Clark v Davis*, 52 AD3d 639, 640 [2d Dept 2008]). These five factors set forth in the Court of Appeals decision of *Chapman* remain the basis for determining whether a landlord had constructive notice of a hazardous lead-based paint condition and thus may be held liable (*see John v Cassidy*, 151 AD3d 1598, 1599 [4th Dept 2017], *rearg denied* 153 AD3d 1676 [4th Dept 2017]).

As to the first *Chapman* factor, defendant, in the lease to plaintiff, retained a right of entry to the premises and assumed a duty to make repairs. "[A] building owner may be charged with constructive notice of defects in those parts of the building into which it has authority to enter"(*Juarez*, 88 NY2d at 647). Here, the lease specifically stated that "Landlord will repair the plumbing, heating and electrical systems" (NYSCEF Doc No. 64, lease, ¶ 8). The lease also stated:

> "Landlord may enter the Apartment at reasonable hours to: repair, inspect, exterminate, install or work on master antennas or other systems or equipment and perform other work that Landlord decides is necessary or desirable. At reasonable hours Landlord may show the Apartment to possible buyers, lenders, or tenants of the entire Building or land. At reasonable hours Landlord may show the Apartment to possible or new tenants during the last 4 months of the Term. Entry by Landlord must be on reasonable notice except in emergency" (*id.* at ¶11).

Indeed, plaintiff testified, at her deposition, that defendant's superintendent, Garcia, entered the premises multiple times to fix other problems inside the apartment, including leaks (NYSCEF Doc No. 48, plaintiff's dep tr at 45, lines 10-25). Plaintiff also attested that "at least once a week, from December 2018 to June 2019, a superintendent named [Garcia], who spoke Spanish, came to [her] apartment in response to complaints that [she] made, or when she came to take out the garbage, and clean the hallway and stairway inside the

13

[* 13]

building" (NYSCEF Doc No. 47, plaintiff's affidavit). Plaintiff further asserted that Garcia "came to the apartment to look at a water leak coming from the ceiling, and a water leak in the bathroom" (*id.*).

Defendant argues that while the lease gave it a right of entry, there is no evidence that it had the ability to enter plaintiff's apartment by a key. Defendant notes that Moloney testified that she did not remember if she had a key to plaintiffs' apartment or if the prior landlord gave her keys to plaintiffs' apartment (NYSCEF Doc No. 49, Moloney's dep tr at 79, lines 17-24). Defendant also asserts that nothing in plaintiff's deposition testimony or affidavit indicates that Garcia let herself into plaintiffs' apartment.

Defendant's argument is unavailing. There is no affirmative testimony by defendant that it did not have a key to plaintiffs' apartment. Moloney merely testified that she did not remember if defendant retained keys to the apartment (*id.* at 79, line 20). Moloney admitted that the lease required the tenant to provide keys to the landlord, and that defendant received keys from the prior landlord at the closing of the sale of the property (which consisted of two apartments) (*id.* at 80, lines 2-8). Moloney merely claimed that she did not recall whether the keys to plaintiffs' apartment were contained within those keys (*id.* at 80, lines 2-14). However, Moloney admitted that Garcia and Kenny were able to enter plaintiffs' apartment, at the time that they observed stamps on the walls that stated, "lead paint" (NYSCEF Doc No. 49, Moloney's dep tr at 107, lines 4-16; at 108, lines 7-8). Moloney also testified that she and the first lead abatement contractor (who was not hired) saw the lead paint stamps while in plaintiff's apartment, and that there was only one room

14

[* 14]

that had been locked and could not be accessed (*id.* at 193, lines 2-7). This shows that defendant had access to the area where the lead paint condition existed and was stamped.

As to Garcia, Moloney testified that she did not recall Garcia or her handyman, Kenny, having any trouble getting into the apartment to fix the light fixtures (*id.* at 187, lines 8-11). Moloney also testified that she did not know of any record of Garcia or Kenny having any problems with respect to putting in the light fixtures, the window guards, or the smoke detectors (*id.* at 187, lines 12-16).

Moloney testified that after she learned of the lead paint condition, she sent the July and August 2019 letters to plaintiff to obtain access to remediate it (*id.* at 183, lines 21-24). Moloney also testified that she asked plaintiff's cousin to assist in obtaining access to remediate the lead paint condition, but did not remember the date on which she made this request (*id.* at 184, lines 17-25; at 186, lines 7-11). Moloney additionally testified that she did not remember how long she had a problem with gaining access to the apartment or whether it was more or less than a week (*id.* at 191, lines 7-14). Moloney did not remember if she ever knocked on plaintiff's door to gain access (*id.* at 186, lines 12-14). As previously noted, Moloney admits that she had access at the time that she walked through the apartment with the first lead paint remediation vendor who she did not hire (*id.* at 194, lines 3-6).

Moloney never testified that she was denied access or unable to gain access to the premises. There is no affidavit submitted by Moloney or Garcia, and there is no deposition testimony by Garcia, which addresses access to the apartment or defendant's right of entry.

15

[* 15]

Thus, there is nothing to refute that defendant had the right of entry as expressly provided in the lease, and the first *Chapman* factor is satisfied.

As to the second *Chapman* factor that defendant knew that the apartment was constructed at a time before lead-based interior paint was banned, Moloney and defendant, as sophisticated real estate investors, must have considered the age of the property when purchasing it. The certified property card (NYSCEF Doc No. 52) discloses that the premises were occupied in the 1930s, which is long before 1960, when New York City banned the use of lead-based paint on interior building surfaces (*see Juarez*, 88 NY2d at 641). Moreover, defendant does not dispute that it was aware of the age of the premises. Thus, this second *Chapman* factor is met.

As to the third *Chapman* factor, i.e., that defendant was aware that paint was peeling on the premises, plaintiff testified, at her deposition, that she told Garcia "[t]hat the painting was chipped - - that the paint was chipping and that it needed to be painted, again" (NYSCEF Doc No. 48, plaintiff's dep tr at 47, lines 18-22). Plaintiff also attested, in her sworn affidavit, that "[o]ne time when [she] saw [Garcia] in the building in the beginning of 2019, [she] complained to her that the paint in the apartment was chipping, that it was in bad condition, and it was in need of repair, but nothing was ever done."

Plaintiff explained that whenever she noticed the paint chips, she would sweep them up and throw them away (NYSCEF Doc No. 48, plaintiff's dep tr at 51, lines 18-21). Plaintiff specifically testified that paint chips were "[a]ll over the place. It was everywhere. On the door, on the door to the bathroom, on the door to the closet, in the windows, the

16

[* 16]

windows of the kitchen. Everywhere" (*id.* at 52, lines 20-24). Plaintiff witnessed D.V. eating paint chips a number of times (*id.* at 54, lines 2-21).

Defendant argues that plaintiff has failed to establish that it knew that the apartment contained defective or peeling paint. Moloney, at her deposition, denied that plaintiff made complaints about chipping paint or made requests for repair prior to the issuance of the lead paint violations (NYSCEF Doc No. 49, Moloney's dep tr at 95, lines 3-9). Moloney testified, at her deposition, that she did not know the condition of the paint in the apartment in January 2019 (*id.* at 198, lines 7-9). Moloney also testified that when she looked at the areas stamped as having lead paint, she did not remember if the paint was peeling in those areas (*id.* at 142, lines 22-24). Moloney, however, when confronted with the DOH's notation on August 16, 2019 that work was not started at the time of its inspection of all areas cited in the Order to Abate Nuisance, as evidenced by chipping and peeling paint, and asked when it says chipping and peeling paint remained, if it was "true in fact . . . that there was chipping and peeling paint inside that apartment," she responded, "I suppose so" (*id.* at 159, lines 2-14).

Thus, Moloney has conceded that at least from the time that the DOH issued the violations, she was aware of chipping and peeling paint. Defendant also never contested the existence of lead paint violations, as cited in the Order to Abate Nuisance, dated July 26, 2019. Moreover, the lead paint violations were evident from the lead paint stamps in the apartment, which were discovered by defendant's workers and of which Moloney was informed and then witnessed herself when she walked around the apartment (*id.* at 193,

17

[* 17]

lines 18-21). Thus, the third *Chapman* factor is satisfied from at least the time of the Order to Abate Nuisance, which Moloney stated, she personally received on August 1, 2019.

As to the fourth *Chapman* factor, i.e., that defendant knew of the hazards of lead-based paint to young children, Moloney admitted that as of 2018, she was aware that there was a lead paint notice that had to be given to tenants who were moving into an apartment, and that a lead paint rider had to be signed stating that the tenants received the lead paint notice regarding lead paint and stating that they understood what was in the notice[6] (NYSCEF Doc No. 49, Moloney's dep tr at 57, lines 16-25). Moloney further admitted that she knew that chipping lead paint was a potential health hazard to small children if they eat or ingest the paint in some form (*id.* at 59, lines 4-25; at 60, lines 2-5; at 66, lines 2-10). Moloney testified that the lead paint disclosure form and the pamphlet that accompanies it indicated the type of harm that can happen to a child if he or she ingested lead and that "maybe" she read the form and pamphlet (*id.* at 61, lines 2-18). In addition, when Moloney was asked at her deposition whether she knew from the time that she received the notice of violation that there were lead-based hazards in the apartment and that they were dangerous to children, she responded "yes" (*id.* at 189, lines 6-10). Thus, the fourth *Chapman* factor is satisfied.

---

[6] Defendant does not claim to have provided this notice to plaintiff. Plaintiff, in her affidavit, attests that at no time did the prior landlord or defendant have her sign a New York City Lead Paint Notice, which would have required that she notify them whether a child under the age of seven years resided in the apartment, or a Window Guard Notice, which would have required that she identify whether a child 10 years of age or younger lived in the apartment (NYSCEF Doc No. 47). However, at the time that plaintiff moved into the apartment and at the time that she renewed her lease with defendant, Local Law 1, which mandates that this lead paint notice be given, did not apply to two-family homes.

18

As to the fifth *Chapman* factor that defendant knew that a young child lived in the apartment, plaintiff testified that Moloney came "[a] number of times" to see the apartment (NYSCEF Doc No. 48, plaintiff's dep tr at 41, lines 23-25). Plaintiff, in her sworn affidavit, also attests that before defendant purchased the building, Moloney came in to look at the apartment, and when she was present in the apartment, D.V., who was then a baby, as well as her other child, K.V., who was then three years old, were present (NYSCEF Doc No. 47). Plaintiff further attests that Moloney saw her two children, and also saw the cribs, highchairs, and baby toys that were in the apartment (*id.*). In addition, plaintiff attests that after defendant purchased the building and before she learned that D.V. had been lead poisoned, Moloney was in her apartment at least 10 to 12 times and that she was told that the reason for Moloney's presence was that defendant was getting ready to sell the building and was showing it to prospective buyers, even though defendant had just purchased it (*id.*). Plaintiff explained that "[e]very time [Moloney] came to [her] apartment, [her] two children, who were three (3) years of age or younger, were present in the apartment" (*id.*).

Plaintiff asserts that additional notice of a child present in the apartment was provided by a June 2019 letter to Moloney from her cousin, Ernesto Hodgson, who, when writing on behalf of plaintiff's family regarding a lease modification, stated that the previous landlord had increased the rent when they found out plaintiff was pregnant (NYSCEF Doc No. 63). Moloney admitted that she remembered receiving this letter (NYSCEF Doc No. 49, Moloney's dep tr at 120, lines 11-23). Plaintiff asserts that notice of a child under six years old can also be imputed from defendant's superintendent, Garcia, who went to the apartment to fix a ceiling leak and a bathroom leak and would tell Moloney

19

[* 19]

about the family's complaints regarding the apartment (NYSCEF Doc No. 48, plaintiff's dep tr at 45, lines 8-25; at 47, lines 4-9).

Moloney admitted that she went for a tour of the property, including both apartments, prior to defendant's purchase of it (NYSCEF Doc No. 49, Moloney's dep tr at 34, lines 11-14). Moloney, however, testified that she only briefly walked into the apartment prior to defendant's purchase of it (*id.* at 35, lines 2-13). Moloney further testified that she did not recall who was in the apartment and did not remember if she discussed who occupied the apartment in the Fall of 2018 (*id.* at 51, lines 2-20). Moloney claimed that she was uncertain as to whether she knew that there were children living in plaintiff's apartment prior to the DOH inspection (NYSCEF Doc No. 70, defendant's Memorandum of Law at paragraph 28). Moloney stated that she was unable to say one way or the other whether she was aware that there were small children living in the apartment in 2018 or January 2019 (*id.* at 113, lines 19-25; at 114, lines 2-5). Moloney testified that she did not remember if she knew that there were small children living there (*id.* at 111, lines 23-25; at 112, line 2).

Moloney admitted that she was aware of the children's presence by August 1, 2019 (*id.* at 145, lines 7-10). This admission was consistent with the fact that defendant had window guards installed to prevent small children from falling out of the apartment's windows (*id.* at 112, lines 8-25). Moloney testified that she saw two small children in the apartment when she went there with the first lead-paint remediation vendor (*id.* at 177, lines 10-24; at 178, lines 13-22). Moloney also acknowledged that the lead paint violation stated that there were small children in the apartment (*id.* at 145, lines 12-17). Thus, the

20

fifth *Chapman* factor has been satisfied at least as of the time that defendant received the Order to Abate Nuisance.

While triable issues of fact exist as to whether plaintiffs satisfied the third and fifth *Chapman* factors prior to D.V.'s lead poisoning on June 14, 2019 (when he had an elevated blood level of 5 ug/dL), there can be no dispute that these factors were satisfied as of the time when the Order to Abate Nuisance was issued on July 26, 2019. Indeed, as of the date that defendant received the Order to Abate Nuisance, it had actual notice both that a child under the requisite age was residing in the apartment and that the apartment contained hazardous levels of lead (*see Juarez*, 88 NY2d at 647-648; *Clark*, 52 AD3d at 640).

Once a landlord is found to have had the requisite notice of the residency of a child under the age of six and that a lead paint hazard exists in the apartment, the landlord's liability then turns on the reasonableness of its efforts to ameliorate the existing lead paint condition (*see Juarez*, 88 NY2d at 644; *Clark*, 52 AD3d at 640; *Ibert v Tuscan Assoc., Inc.*, 37 AD3d 194, 196 [1st Dept 2007]). In addition, the plaintiff must demonstrate that the child's lead poisoning is causally connected to the lead paint condition in the apartment (*see Juarez*, 88 NY2d at 648).

Here, there is no issue as to the reasonableness of defendant's abatement efforts after receiving actual notice of the lead paint condition since it made none (*see Jocelyn C. v Soundview Apts. Realty, LLC*, 154 AD3d 573, 573 [1st Dept 2017]). Defendant only went to the apartment with a lead abatement contractor which it did not hire. Moloney admitted that HPD had to perform the abatement work because defendant "took too long" to start it (NYSCEF Doc No. 49, Moloney's dep tr at 138, lines 23-25).

21

[* 21]

During the time period after defendant had actual notice, D.V. continued to be exposed to the lead paint condition and his blood lead level dramatically increased to 10 ug/dL, double the blood lead level that he had on June 14, 2019, as shown by his blood lead test on September 26, 2019, shortly after HPD performed the remediation work due to defendant's failure to commence any abatement work (NYSCEF Doc No. 59). Thus, defendant's failure to timely remediate the lead paint condition resulted in D.V.'s further exposure to lead paint (*see Galicia v Ramos*, 303 AD2d 631, 632-633 [2d Dept 2003]; *Woods v Alvarez*, 300 AD2d 301, 302 [2d Dept 2002]; *Bellony v Siegel*, 288 AD2d 411, 412 [2d Dept 2001]). The court, therefore, finds that defendant may be held liable for D.V.'s injuries sustained after the time that it, by the Notice to Abate Nuisance, had actual notice of the lead paint condition in the apartment, to the extent that such injuries are shown to be proximately caused by such lead paint condition.

Plaintiffs contend that lead creates an indivisible brain injury, and, as a result, defendant must be held liable for all injuries caused by D.V.'s lead poisoning, both before it had actual notice of the lead paint condition and after it had such actual notice. It has been held that where the record is devoid of any proof which would render a plaintiff's injuries "divisible" and enable the jury to apportion damages to separate periods of culpability and provide the jury a nonspeculative basis upon which to make a practical division of a plaintiff's injuries, a defendant may be held liable for all such injuries, i.e., prenotice and post-notice periods of exposure to lead paint, without apportionment (*see La Fountaine v Franzese*, 282 AD2d 935, 938 [3d Dept 2001]; *Zandre T. v Beulah Church of God in Christ Jesus, Inc.*, 24 Misc 3d 1234[A], 2009 NY Slip Op 51748[U], *5 [Sup Ct,

Kings County 2009]). Here, defendant has not presented any proof which would render D.V.'s injuries "divisible" and enable the apportionment of damages with respect to prenotice and post-notice periods of exposure to lead paint. Indeed, D.V. had substantially higher blood lead levels post-notice than he had prenotice. Thus, due to the indivisibility of any injuries sustained by D.V. due to his lead paint exposure, defendant must be held responsible for all injuries caused by lead poisoning in the apartment (*see Tejeda v 116 W. Corp.*, 293 AD2d 261, 261 [1st Dept 2002], *lv denied* 99 NY2d 502 [2002]; *La Fountaine*, 282 AD2d at 938).

However, as to causation, a plaintiff moving for summary judgment must establish "a legally sufficient causal nexus between the alleged breach and the claimed damages" (*Chapman*, 97 NY2d at 22). Plaintiff has set forth D.V.'s claimed injuries in their bill of particulars (NYSCEF Doc No. 46). Plaintiff has submitted the report of Daniel Adler, M.D., which is affirmed pursuant to CPLR 2106 (NYSCEF Doc No. 50). Dr. Adler, who specializes in pediatric neurology, saw D.V. in a pediatric neurological consultation on January 12, 2023. Dr. Adler's clinical impressions were lead poisoning, low muscle tone with fine and gross motor incoordination, dysarthria (a speech disorder caused by muscle weakness), and cognitive impairment. Dr. Adler sets forth that D.V. has low tone and is poorly coordinated, and that his speech is poorly articulated. Dr. Adler states that these developmental variations are highly correlated with learning challenges in the future. Dr. Adler further states that while lead poisoning does not cause these neurodevelopmental disabilities, lead poisoning will negatively affect the therapies that children like D.V. require in order to make developmental progress. Dr. Adler opines, to a reasonable degree

23

[* 23]

of medical certainty, that if D.V. had not been lead poisoned, his overall level of intellectual and future academic functioning would have been higher. Dr. Adler further opines, to a reasonable degree of medical certainty, that D.V.'s exposure to lead paint in the apartment owned by defendant was the substantive cause of D.V.'s cognitive and intellectual deficits.

Dr. Adler states that he reviewed the records of the New York City Department of Health and Mental Hygiene, the records of the Wycoff Heights Medical Center, the records of Allergy and Asthma Care of Brooklyn, the records of New York Presbyterian Hospital, the laboratory test results from LabCorp, and the records of Ridgewood Pediatrics. Dr. Adler also states that he reviewed the expert report of Vicki Sudhalter, Ph.D., dated January 7, 2023. Dr. Adler notes that Dr. Vicki Sudhalter, who is a psychologist, performed a neuropsychological evaluation on D.V., reviewed D.V.'s medical records, and administered numerous tests on D.V. He points out that Dr. Sudhalter observed that D.V. had an IQ in the average range with a significant difference between verbal comprehension and non-language composites such as visuospatial and working memory, and that D.V. had a severe articulation and syntax deficit. He notes that it was the impression of Dr. Sudhalter that lead poisoning had contributed to D.V.'s documented cognitive, social, and behavioral impairments.

Defendant, in response, states that plaintiffs have not exchanged a copy of Dr. Sudhalter's report, but have only provided their expert disclosure, in which plaintiff's counsel discusses Dr. Sudhalter's expected testimony and her findings (NYSCEF Doc No. 76). This expert disclosure states, in detail, Dr. Sudhalter's evaluation of D.V., and her findings and conclusions as to D.V.'s intelligence assessment, neuropsychological

24

assessment, sensory-motor functioning, learning and memory, and executive functioning, and it appears to contain the contents of Dr. Sudhalter's report (*id.*). It specifically states that based upon consideration of D.V.'s neurobehavioral and neuropsychological deficits, medical history and the current medical literature, Dr. Sudhalter will opine that brain damage from lead poisoning has significantly contributed to documented cognitive, social, and behavioral impairments (*id.*).

No affirmed report by Dr. Sudhalter has been submitted. Defendant contends that Dr. Adler, in his report, depends and relies upon the findings and opinions of Dr. Sudhalter and that this is not a proper foundation upon which an expert may base his opinions and conclusions. Defendant notes that there is nothing in D.V.'s medical records, which have been submitted by plaintiff, which show any cognitive injury sustained by D.V. (NYSCEF Doc No. 51).

D.V. was examined by defendant's expert, Walter Molofsky, M.D., a pediatric neurologist, on January 4, 2022. Dr. Molofsky, in his report, opines that there is no evidence of any decrement in function from D.V.'s lead exposure (NYSCEF Doc No. 73). D.V. was tested by defendant's expert, David M. Masur, Ph.D., a neuropsychologist, on July 7, 2022. Dr. Masur, in his report, opines that D.V. demonstrated no evidence for the presence of any cognitive deficit that could be causally related to his history of elevated lead levels (NYSCEF Doc No. 74).

However, neither Dr. Molofsky's expert report nor Dr. Masur's expert report is affirmed. Since both of these reports are unsworn, they are not in admissible form and do not constitute competent evidence. Therefore, they may not be considered in opposition to

25

[* 25]

plaintiffs' summary judgment motion and cannot create a triable issue of fact as to causation (*see* CPLR 2106; *Ulm I Holding Corp. v Antell*, 155 AD3d 585, 586 [1st Dept 2017]; *Mazzola v City of New York*, 32 AD3d 906, 907 [2d Dept 2006]).

In any event, defendant argues that Dr. Adler improperly relies upon Dr. Sudhalter's report, which has not been exchanged. The court notes that since Dr. Sudhalter's report has not been submitted to the court, it cannot be ascertained if it was sworn. It is true that an affirmed report by a medical expert may not properly rely on an unsworn, and therefore inadmissible, report, to conclude that the plaintiff suffered actual injuries (*see Concepcion v Walsh*, 38 AD3d 317, 318 [1st Dept 2007]; *Lora v Calle*, 16 AD3d 359, 360 [1st Dept 2005]; *Vallejo v Builders for Family Youth, Diocese of Brooklyn, Inc.*, 18 AD3d 741, 742 [2d Dept 2005]). Contrary to defendant's argument, however, Dr. Adler does not base his opinion solely on Dr. Sudhalter's report. Rather, Dr. Adler bases his conclusions on his own examination and clinical impressions.

Plaintiffs' proof suffices to establish prima facie causation. In particular, plaintiffs have produced evidence that the apartment contained hazardous levels of lead-based paint, that D.V. was observed ingesting paint chips, that D.V. had elevated blood levels of lead, and that D.V. had lived in the apartment since birth. Furthermore, Dr. Adler, in his expert affirmation, opines, to a reasonable degree of medical certainty, that had D.V. not been lead poisoned, his overall level of intellectual and future academic functioning would have been higher, that D.V.'s exposure to lead paint in his apartment was the substantive cause of his cognitive and intellectual deficits, and that lead poisoning will negatively affect the therapies that D.V. will require in order to make developmental progress (NYSCEF Doc

26

No. 50). Defendant, in opposition, has submitted no evidence that D.V.'s lead poisoning was related to any factors other than his exposure to lead in the apartment.

Furthermore, while defendant, without admissible sworn expert affidavits, argues that D.V. was not injured by his lead poisoning, D.V.'s elevated blood lead levels and Dr. Adler's expert affidavit establish that D.V. sustained an actionable injury (*see Taylor v Brooke Towers LLC*, 73 AD3d 535, 536 [1st Dept 2010]; *Bygrave v New York City Hous. Auth.*, 65 AD3d 842, 847 [1st Dept 2009]; *Kydd v Daarta Realty Corp.*, 60 AD3d 997, 998 [2d Dept 2009]; *Baez v Sugrue*, 300 AD2d 519, 521 [2d Dept 2002]; *Wynn v T.R.I.P. Redevelopment Assoc.*, 296 AD2d 176, 184 [3d Dept 2002]). The issue of the extent of the injuries sustained by D.V. as a result of his elevated blood lead levels go to the question of damages (*see Lanza v Delbalso*, 217 AD3d 664, 665 [2d Dept 2023]; *Foster v Alfred S. Friedman Mgt. Corp.*, 63 AD3d 446, 447 [1st Dept 2009]; *Munoz v Mael Equities*, 2 AD3d 118, 119 [1st Dept 2003]).

## Conclusion

Accordingly, plaintiffs' motion, under motion sequence number four, for summary judgment on the issue of liability is granted. This matter shall be set down for an assessment of damages.

This constitutes the decision and order of the court.

ENTER,

KW

A. J. S. C.

Hon. Kerry J. Ward, A.J.S.C.

27